# EXHIBIT A

RECEIVED
JAN 13 2025
Bureau of Ocean Energy
Management
Pacific Region

**AMENDMENT AND RESTATEMENT**
**of**

**Renewable Energy Lease OCS-P 0565**

This Amendment and Restatement of Renewable Energy Lease OCS-P 0565 (the "Lease) is made and entered into by and between the United States of America, ("Lessor"), acting through the Bureau of Ocean Energy Management ("BOEM"), its authorized officer, and Invenergy California Offshore LLC (the "Lessee").

WITNESSETH:

THAT WHEREAS the lease, containing approximately 80,418, was entered into by and between the Lessor and Invenergy California Offshore LLC, effective as of June 1, 2023;

NOW, THEREFORE, in consideration of the premises, the Lessor and Lessee hereby agree that Lease OCS-P 0565 is amended and restated in its entirety to read as follows:

<table>
<tr><td rowspan="3">UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF OCEAN ENERGY MANAGEMENT<br><br>COMMERCIAL LEASE OF SUBMERGED LANDS FOR RENEWABLE ENERGY DEVELOPMENT ON THE OUTER CONTINENTAL SHELF<br><br>Paperwork Reduction Act of 1995 statement: This form does not constitute an information collection as defined by 44 U.S.C. § 3501 et seq. and therefore does not require approval by the Office of Management and Budget.</td><td>Office<br><br>Camarillo, CA</td><td>Renewable Energy Lease Number<br><br>OCS-P 0565</td></tr>
<tr><td>Cash Bonus and/or Acquisition Fee<br>$111,769,231<br>($145,300,000 Bonus Bid – $33,530,769 Bidding Credit)</td><td>Resource Type<br><br>Wind</td></tr>
<tr><td>Effective Date<br><br>June 1, 2023</td><td>Block Number(s)<br><br>See Addendum A</td></tr>
</table>

This lease, which includes any addenda hereto, is hereby entered into by and between the United States of America, ("Lessor"), acting through the Bureau of Ocean Energy Management ("BOEM"), its authorized officer, and

| Lessee | Interest Held |
|---|---|
| Invenergy California Offshore LLC | 100% |

("Lessee"). This lease is effective on the date written above ("Effective Date") and will continue in effect until the lease terminates as set forth in Addendum "B." In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, covenants, and stipulations contained herein and attached hereto, the Lessee and the Lessor agree as follows:

**Section 1: Statutes and Regulations.**

This lease is issued pursuant to subsection 8(p) of the Outer Continental Shelf Lands Act ("the Act"), 43 U.S.C. §§ 1331 *et seq.* This lease is subject to the Act and regulations promulgated pursuant to the Act, including but not limited to, offshore renewable energy regulations at 30 CFR Part 285 30 CFR Part 585 as well as other applicable statutes and regulations in existence on the Effective Date of this lease. This lease is also subject to those statutes enacted (including amendments to the Act or other statutes) and regulations promulgated thereafter, except to the extent that they explicitly conflict with an express provision of this lease. It is expressly understood that amendments to existing statutes, including but not limited to the Act, and regulations may be made, and/or new statutes may be enacted or new regulations promulgated, which do not explicitly conflict with an express provision of this lease, and that the Lessee bears the risk that such amendments, regulations, and statutes may increase or decrease the Lessee's obligations under the lease.

**Section 2: Rights of the Lessee.**

(a) The Lessor hereby grants and leases to the Lessee the exclusive right and privilege, subject to the terms and conditions of this lease and applicable regulations, to: (1) submit to the Lessor for approval a Site Assessment Plan (SAP) and Construction and Operations Plan (COP) for the lease activities identified in Addendum "A" of this lease; and (2) conduct activities in the area identified in Addendum "A" of this lease ("leased area") and/or

Addendum "D" of this lease ("project easement(s)"), that are described in a SAP or COP that has been approved by the Lessor. This lease does not, by itself, authorize any activity within the leased area.

(b) The rights granted to the Lessee herein are limited to those activities described in any SAP or COP approved by the Lessor. The rights granted to the Lessee are limited by the lease-specific terms, conditions, and stipulations required by the Lessor in Addendum "C."

(c) This lease does not authorize the Lessee to conduct activities on the Outer Continental Shelf (OCS) relating to or associated with the exploration for, or development or production of, oil, gas, other seabed minerals, or renewable energy resources other than the renewable energy resources identified in Addendum "A."

(d) The Lessee may request a suspension of this lease from Lessor under 30 CFR § 585.416 for up to two years per request. The suspension will be in effect for the period specified by Lessor in the suspension order, unless the Lessee requests an earlier termination of the suspension. If the Lessee so requests, the Lessor may end the suspension on the date requested by the Lessee, or at any time before the specified end date. Nothing in this provision should be read to limit BSEE's authority.

**Section 3: Reservations to the Lessor.**

(a) All rights in the leased area and project easement(s) not expressly granted to the Lessee by the Act, applicable regulations, this lease, or any approved SAP or COP, are hereby reserved to the Lessor.

(b) The Lessor will decide whether to approve or disapprove a SAP or COP in accordance with the applicable regulations in 30 CFR Part 585 including 30 CFR § 585.102(a). Disapproval of plans will not subject the Lessor to liability under the lease. The Lessor also retains the right to approve a SAP or COP with conditions, as provided in applicable regulations.

(c) The Lessor reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of Section 12 of the Act and applicable regulations, provided that compensation must be paid to the Lessee as provided by 43 U.S.C. § 1341(c) and (d).

(d) The Lessor reserves the right to authorize other uses within the leased area and project easements(s) that will not unreasonably interfere with activities described in a SAP and/or COP approved pursuant to this lease.

**Section 4: Payments.**

(a) The Lessee must make all rent payments to the Lessor in accordance with applicable regulations in 30 CFR Part 585, unless otherwise specified in Addendum "B."

(b) The Lessee must make all operating fee payments to the Lessor in accordance with applicable regulations in 30 CFR Part 585, as specified in Addendum "B."

**Section 5: Plans.**

The Lessee may conduct those activities described in Addendum "A" only in accordance with a SAP or COP approved by the Lessor. The Lessee may not deviate from an approved SAP or COP except as approved pursuant to applicable regulations in 30 CFR Part 585.

**Section 6: Associated Project Easement(s).**

Pursuant to 30 CFR § 585.200(b), the Lessee has the right to one or more project easement(s), without further competition, and for the purpose of installing, maintaining, repairing and replacing: gathering, transmission, distribution, and inter-array cables; power and pumping stations; facility anchors; pipelines; and associated facilities and other appurtenances on the OCS as necessary for the full enjoyment of the lease, under applicable regulations in 30 CFR Part 285 and 30 CFR Part 585. As part of submitting a COP for approval, the Lessee may request that one or more easement(s) be granted by the Lessor. If the Lessee requests that one or more easement(s) be granted when submitting a COP for approval, such project easements will be granted by the Lessor in accordance with the Act and applicable regulations in 30 CFR Part 585 upon approval of the COP in which the Lessee has demonstrated a need for such easements. Such easements must be in a location acceptable to the Lessor, and will be subject to such conditions as the Lessor may require. The project easement(s) issued in conjunction with an approved COP under this lease will be incorporated into this lease as described in Addendum "D".

**Section 7: Conduct of Activities.**

The Lessee must conduct, and agrees to conduct, all activities in the leased area and project easement(s) in accordance with an approved SAP or COP, all applicable laws and regulations and the lease-specific terms, conditions and stipulations in Addendum "C.

The Lessee further agrees that no activities authorized by this lease will be carried out in a manner that:

(a) could unreasonably interfere with or endanger activities or operations carried out under any lease or grant issued or maintained pursuant to the Act, or under any other license or approval from any Federal agency;

(b) could cause any undue harm or damage to the environment;

(c) could create hazardous or unsafe conditions; or

(d) could adversely affect sites, structures, or objects of historical, cultural, or archaeological significance without notice to and direction from the Lessor on how to proceed.

**Section 8: Violations, Suspensions, Cancellations, and Remedies.**

If the Lessee fails to comply with (1) any of the applicable provisions of the Act or regulations, (2) the approved SAP or COP, or (3) the terms of this lease, including associated Addenda, the Lessor may exercise any of the remedies that are provided under the Act and applicable regulations, including, without limitation, issuance of cessation of operations orders, suspension or cancellation of the lease, and/or the imposition of penalties, in accordance with the Act and applicable regulations.

The Lessor may also cancel this lease for reasons set forth in subsection 5(a)(2) of the Act (43 U.S.C. § 1334(a)(2)), and for reasons provided by the Lessor pursuant to 30 § CFR 585.422. Any cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of the Act (43 U.S.C. § 1334 (a)(2)(B) and (C)).

Any cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities.

Non-enforcement by the Lessor of a remedy for any particular violation of the applicable provisions of the Act or regulations, or the terms of this lease, will not prevent the Lessor from exercising any remedy, including cancellation of this lease, for any other violation or for the same violation occurring at any other time.

**Section 9: Indemnification.**

The Lessee hereby agrees to indemnify the Lessor for, and hold the Lessor harmless from, any claim caused by or resulting from any of the Lessee's operations or activities on the leased area or project easement(s) or arising out of any activities conducted by or on behalf of the Lessee or its employees, contractors (including Operator, if applicable), subcontractors, or their employees, under this lease, including claims for:

a. loss or damage to natural resources,
b. the release of any petroleum or any Hazardous Materials,
c. other environmental injury of any kind,
d. damage to property,
e. injury to persons, and/or
f. costs or expenses incurred by the Lessor.

Except as provided in any addenda to this lease, the Lessee will not be liable for any losses or damages proximately caused by the activities of the Lessor or the Lessor's employees, contractors, subcontractors, or their employees. The Lessee must pay the Lessor for damage, cost, or expense due and pursuant to this Section within 90 days after written demand by the Lessor. Nothing in this lease will be construed to waive any liability or relieve the Lessee from any penalties, sanctions, or claims that would otherwise apply by statute, regulation, operation of law, or that could be imposed by the Lessor or other government agency acting under such laws.

"Hazardous Material" means

1. A "hazardous substance" or a "pollutant or contaminant" as defined by the *Comprehensive Environmental Response, Compensation, and Liability Act* at 42 U.S.C. §§ 9601(14) and (33);
2. Any "regulated substance" as defined by the Resource Conservation and Recovery Act ("RCRA") at 42 U.S.C. § 6991(7), whether or not contained in or released from underground storage tanks, and any hazardous waste regulated under RCRA pursuant to 42 U.S.C. §§ 6921 *et seq.*;
3. "Oil," as defined by the Clean Water Act at 33 U.S.C. § 1321(a)(1) and the Oil Pollution Act at 33 U.S.C. § 2701(23); or
4. Other substances that applicable Federal, state, Tribal, or local laws define and regulate as "hazardous."

**Section 10: Financial Assurance.**

The Lessee must at all times maintain the financial assurance required prior to issuance of this lease, as provided in 30 CFR Part 585. The Lessee must also provide and maintain a supplemental surety bond(s) or other authorized financial assurance if the Lessor determines that additional financial

assurance is necessary to ensure compliance with 30 CFR Part 585, applicable plan approvals, and the terms and conditions of this lease.

**Section 11: Assignment or Transfer of Lease.**

This lease may not be assigned or transferred in whole or in part without written approval of the Lessor. The Lessor reserves the right, in its sole discretion, to deny approval of the Lessee's application to transfer or assign all or part of this lease, in accordance with applicable regulations in 30 CFR Part 585. Any assignment or transfer made in contravention of this section is void.

**Section 12: Relinquishment of Lease.**

The Lessee may relinquish this entire lease or any officially designated subdivision thereof by filing with the appropriate office of the Lessor a written relinquishment application, in accordance with applicable regulations in 30 CFR Part 585. No relinquishment of this lease or any portion thereof will relieve the Lessee or its surety of the obligations accrued hereunder, including but not limited to, the responsibility to remove property and restore the leased area and project easement(s) pursuant to section 13 of this lease and applicable regulations.

**Section 13: Removal of Property and Restoration of the Leased Area and Project Easement(s) on Termination of Lease.**

Unless otherwise authorized by the Lessor, pursuant to the applicable regulations in 30 CFR Part 285 and 30 CFR Part 585, the Lessee must remove or decommission all facilities, projects, cables, pipelines, and obstructions and clear the seafloor of all obstructions created by activities on the leased area and project easement(s) within two years following lease termination, whether by expiration, cancellation, contraction, or relinquishment, in accordance with any approved SAP, COP, or approved Decommissioning Application, and applicable regulations in 30 CFR Part 585.

**Section 14: Safety Requirements.**

The Lessee must:

a. maintain all places of employment for activities authorized under this lease in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating under this lease;

b. maintain all operations within the leased area and project easement(s) in compliance with regulations in 30 CFR Part 285 and 30 CFR Part 585 and orders from the Lessor and other Federal agencies with jurisdiction, intended to protect persons, property and the environment on the OCS; and

c. provide any requested documents and records, which are pertinent to occupational or public health, safety, or environmental protection, and allow prompt access, at the site of any operation or activity conducted under this lease, to any inspector authorized by the Lessor or other Federal agency with jurisdiction.

**Section 15: Debarment Compliance.**

The Lessee must comply with the Department of the Interior's non-procurement debarment and suspension regulations set forth in 2 CFR Parts 180 and 1400 and must communicate the requirement to comply with these regulations to persons with whom it does business related to this lease by including this requirement in all relevant contracts and transactions.

**Section 16: Equal Opportunity Clause.**

During the performance of this lease, the Lessee must fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Section 17: Certification of Nonsegregated Facilities.**

By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees. Segregated facilities include those that are segregated by explicit directive or those that are in fact segregated on the basis of race, color, religion, sex, or national origin, because of habit, local custom, or otherwise; provided, that separate or single-user restrooms and necessary dressing or sleeping areas must be provided to assure privacy as appropriate. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to awarding contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Section 18: Notices.**

All notices or reports provided from one party to the other under the terms of this lease must be in writing, except as provided herein and in the applicable regulations in 30 CFR Part 585. Written notices and reports must be delivered to the Lessee's or Lessor's Lease Representative, as specifically listed in Addendum "A," either electronically, by hand, by facsimile, or by United States first class mail, adequate postage prepaid. Each party must, as soon as practicable, notify the other of a change to their Lessee's or Lessor's Contact Information listed in Addendum "A" by a written notice signed by a duly authorized signatory and delivered by hand or United States first class mail, adequate postage prepaid. Until such notice is delivered as provided in this section, the last recorded contact information for either party will be deemed current for service of all notices and reports required under this lease. For all operational matters, notices and reports must be provided to the party's Operations Representative, as specifically listed in Addendum "A," as well as the Lease Representative.

**Section 19: Severability Clause.**

If any provision of this lease is held unenforceable, all remaining provisions of this lease will remain in full force and effect.

**Section 20: Modification.**

Unless otherwise authorized by the applicable regulations in 30 CFR Part 585, this lease may be modified or amended only by mutual agreement of the Lessor and the Lessee. No such modification or amendment will be binding unless it is in writing and signed by duly authorized signatories of the Lessor and the Lessee.

**Section 21: Variance.**

The Lessee may submit a written request via email to the BOEM Office of Renewable Energy Programs Chief and/or the Bureau of Safety and Environmental Enforcement (BSEE) via TIMSWeb (https://timsweb.bsee.gov/), requesting a variance from the requirements of this lease. The request must explain why compliance with a particular requirement is not technically and/or economically practicable or feasible and any alternative actions the Lessee proposes to take. To the extent not otherwise prohibited by law and after consideration of all relevant facts and applicable legal requirements, BOEM and/or BSEE may grant the request for a variance if the appropriate Bureau(s) determine that the variance: -(1) would not result in a change in the project impact levels described in the Environmental Assessment EA and the Finding of No Significant Impact issued for this lease; (2) would not alter obligations or commitments resulting from consultations performed by BOEM and BSEE under federal law in connection with this lease in a manner that would require BOEM to re-initiate or perform additional consultations (e.g., Endangered Species Act (ESA), Coastal Zone Management Act, National Historic Preservation Act (NHPA)); and (3) would not alter BOEM's determination that the activities associated with the project would be conducted in accordance with Section 8(p)(4) of the Outer Continental Shelf Lands Act (OCSLA). After making a determination regarding a request for a variance, BOEM and/or BSEE will notify the Lessee in writing whether the appropriate Bureau(s) will approve the proposed variance from the lease requirement(s) identified above. Approvals of variance requests will be made publicly available.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "A"**

DESCRIPTION OF LEASED AREA AND LEASE ACTIVITIES

Lease Number OCS-P 0565

I. Lessor and Lessee Contact Information
Lessee Company Number: 15152

(a) Lessor's Contact Information

| | **Lease Representative** | **Operations Representative** |
|---|---|---|
| Title | Regional Director | Same as Lease Representative |
| Address | U.S. Department of the Interior<br>Bureau of Ocean Energy Management<br>Pacific Regional Office<br>Mail Stop CM 102<br>760 Paseo Camarillo, Suite 102<br>Camarillo, CA 93010-6002 | |
| Phone | (855) 320-1484 | |
| Fax | (805) 388-1049 | |
| Email | renewableenergypocs@boem.gov | |

(b) Lessee's Contact Information

| | **Lease Representative** | **Operations Representative** |
|---|---|---|
| Name | James Shield | Same as Lease Representative |
| Title | Vice President | |
| Address | One South Wacker Drive<br>Suite 1800<br>Chicago. IL 60606 | |
| Phone | (312) 224-1400 | |
| Fax | | |
| Email | jshield@invenergy.com | |

II. Description of Leased Area
The total acreage of the leased area is approximately 80,418 acres.

This area is subject to later adjustment, in accordance with applicable regulations (*e.g.*, contraction, relinquishment, etc.) in 30 CFR Part 585.

**Lease OCS-P 0565**

The following Blocks or portions of Blocks lying within Official Protraction Diagram NI10-03 are depicted on the map below and comprise 80,418 acres, more or less.

1) Block 6304, NE1/4 of SW1/4, NW1/4 of SE1/4, SE1/4 of SW1/4, SW1/4 of SE1/4, SE1/4 of SE1/4
2) Block 6305, SW1/4 of SW1/4
3) Block 6354, All of Block
4) Block 6355, W1/2
5) Block 6404, All of Block
6) Block 6405, S1/2, NW1/4 of NW1/4, NE1/4 of NW1/4, SW1/4 of NW1/4, SE1/4 of NW1/4, SW1/4 of NE1/4
7) Block 6406, SW1/4 of SW1/4
8) Block 6454, All of Block
9) Block 6455, All of Block
10) Block 6456, S1/2, S1/2 of N1/2, NW1/4 of NW1/4, NE1/4 of NW1/4
11) Block 6457, SW1/4, SW1/4 of NW1/4, SE1/4 of NW1/4, SW1/4 of SE1/4
12) Block 6504, All of Block
13) Block 6505, All of Block
14) Block 6506, All of Block
15) Block 6507, All of Block
16) Block 6508, NW1/4 of SW1/4, SW1/4 of SW1/4, SE1/4 of SW1/4
17) Block 6554, N1/2, N1/2 of S1/2
18) Block 6555, N1/2, NW1/4 of SW1/4, NE1/4 of SW1/4, NW1/4 of SE1/4
19) Block 6556, N1/2
20) Block 6557, N1/2
21) Block 6558, S1/2 of N1/2, NW1/4 of NW1/4, NE1/4 of NW1/4, NW1/4 of NE1/4

For the purposes of these calculations, a full Block is 2,304 hectares. The acreage of a hectare is 2.471043930 acres.

**Map of Lease OCS-P 0565**




III. <u>Renewable Energy Resource</u>

Wind

IV. <u>Description of the Lease Activities</u>

Generation of energy using wind turbine generators and associated offshore substation platforms, inner array cables, and subsea export cables. Site assessment activities consistent with 30 CFR § 585.600(a)(1).

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "B"**

LEASE PERIODS AND PAYMENTS

Lease Number OCS-P 0565

I. Lease Periods

The duration of each period of the lease is described below. The Lessor may extend or otherwise modify the periods in accordance with applicable regulations in 30 CFR Part 585.

| Period | Duration |
|---|---|
| The Preliminary Period | begins on the effective date of the lease and ends either when a COP is received by the Lessor for review or at the expiration of six years, whichever occurs first. |
| The COP Review Period | begins when the Lessor receives a COP from the Lessee and ends upon COP approval, disapproval, or approval with conditions. |
| The Design and Construction Period | begins at COP approval and ends when the operations period begins. |
| The Operations Period | begins when the requirements of 30 CFR 285.637 are met and ends in 35 years or the duration included and approved as part of the Lessee's COP. |

Renewal: The Lessee may request renewal for all lease periods for good cause, in accordance with applicable regulations in 30 CFR part 585. Good cause for extension of a Preliminary Period may include Lessee's inability to procure an offtake agreement after reasonable efforts, and good cause for extension of an Operations Period may include if a project's design and verification indicate a useful life longer than the leased Operations Period.

The Lessor, at its discretion, may approve a renewal request to conduct substantially similar activities as were originally authorized under this lease or in an approved plan. The Lessor will not approve a renewal request that involves development of a type of renewable energy not originally authorized in the lease. The Lessor may revise or adjust payment terms of the original lease as a condition of lease renewal.

II. Definitions

"Effective Date" has the same meaning as "effective date" in the Bureau of Ocean Energy Management (BOEM) regulations provided in 30 CFR 585.237.

"Lease Anniversary" refers to the anniversary of the Effective Date of the lease.

"End Date" refers to the earlier of a) the last calendar day of the last month of the Operations Period; or b) the date on which the lease terminates for another reason under 30 CFR § 585.432.

"Commercial Operations" means the generation of electricity or other energy product for commercial use, sale, transmission, or distribution.

"Commercial Operation Date," or "COD," refers to the date on which the Lessee first begins Commercial Operations on the lease.

"Delivery Point" is the meter identified in the Construction and Operations Plan (COP) where the Lessee's facility interconnects with the electric grid to deliver electricity for sale.

"Available for Commercial Operations" means the date on which an individual wind turbine generator (WTG) is engaged in Commercial Operations on the lease. An individual WTG is no longer available for Commercial Operations on the first day is permanently decommissioned. These dates are determined by the COP, the Facility Design Report (FDR), or Fabrication and Installation Report (FIR).

III. Lease Payments

Unless otherwise authorized by the Lessor in accordance with the applicable regulations in 30 CFR Part 585, the Lessee must make payments as described below.

(a) ***Rent.*** The Lessee must pay rent as described below:

Rent payments prior to the COD, or prior to the lease End Date in the event that the lease terminates prior to the COD, are calculated by multiplying the acres in the leased area times the rental rate per acre. The acreage for the lease is documented in Addendum "A". For example:

- Acres: 100,000
- Annual Rental Rate: $3.00 per acre or fraction thereof
- Rental Fee for Entire Leased Area: $3.00 x 100,000 = $300,000

The first year's rent payment is due within 45 days of the date that the Lessee receives a copy of the executed lease from the Lessor, in accordance with 30 CFR 585.500(c)(3). Rent for the entire leased area for the next year and for each subsequent year is due on or before each Lease Anniversary through the year in which the COD occurs. The rent for each year subsequent to the COD on the portion of the lease not authorized for Commercial Operations is due on or before each Lease Anniversary.

Rental payments account for lease acreage that will begin commercial operations during the upcoming lease year. Rent will only be due for the undeveloped or non-operating acreage. The rent calculation becomes a three-step process:

(1) rent is calculated on the portion of the lease not authorized for commercial operations.

(2) rent is calculated on the portion of the lease authorized for commercial operations but without operating turbines.

(3) the sum of (1) and (2) yield the rent due.

**Step (1)**: The Lessee will continue to pay rent at the lease rate for acreage outside the approved commercial project area. The demarcation between acreage for a commercial project and undeveloped acreage will be defined in the COP or supplemental documents approved by BOEM. For example, if the total lease acreage is 100,000 acres and exactly one-quarter of the lease acreage is approved for commercial operations, 75,000 acres is not authorized for commercial operations.

- Acres: 75,000
- Annual Rental Rate: $3.00 per acre or fraction thereof
- Rental Fee for Undeveloped Leased Area: $3.00 x 75,000 = $225,000

**Step (2)**: The portion of the acreage covered by approved Commercial Operations subject to rent will be equal to one minus the operating nameplate capacity divided by the total nameplate capacity, $\frac{M_t}{\sum N_w}$, as defined in Section III (b) (4) below, prior to any adjustments as specified in the most recent approved COP for turbine maintenance, replacements, repowering, or decommissioning. If contiguous acreage for an approved project cannot be developed due to buffers or other surface occupancy restrictions, it will be considered part of the operating area of the lease and covered by the lease's operating fee payment.

- Acres: 25,000
- Annual Rental Rate: $3.00 per acre or fraction thereof
- Rental Fee for Undeveloped Acreage Authorized for Commercial Operations: $3.00 x 25,000 x $(1 - \frac{M_t}{\sum N_w})$ = $Rent

Using the summed capacity of 14.21 megawatts (MW) from the 30 MW project in Table 1 from Section III (b) (4) below, the rental calculation for the project area is: $3.00 x 25,000 x (1 - 0.473667) = $39,475

**Step (3)**: Summing the rent due in steps (1) & (2): $225,000 + $39,475 = $264,475.

- The Adjusted Annual Rent Payment will be rounded up to the nearest dollar.

All rent payments must be made as required in 30 CFR 1218.51. Late rent payments will be charged underpayment interest in accordance with 30 CFR 1218.54.

All rent payments, including the last rent payment, are payable for the full year.

During the construction and decommissioning periods, the rental paid can be adjusted following a reconciliation process. The adjustment of rent for the commercial project area will be calculated based on actual construction and decommissioning dates and will equal the fractional remainder of the operating nameplate capacity as calculated for $M_t$ in (b)(4) below. The Lessee should work with BOEM's Pacific Regional Office and the Office of Natural Resources Revenue (ONRR) on any payment reconciliation as instructed in Section III (c).

(1) ***Project Easement.***

Rent for any project easement(s) is described in Addendum "D."

(2) ***Relinquishment.***

If the Lessee submits an application for relinquishment of a portion of the leased area within the first 45 calendar days following the date that the lease is received by the Lessee for execution, and the Lessor approves that application, no rent payment will be due on that relinquished portion of the leased area. Later relinquishments of any leased area will reduce the Lessee's rent payments due the year following the Lessor's approval of the relinquishment, through a reduction in the acres in the leased area, the corresponding rent payment for the entire leased area, and any related adjusted annual rent payments.

(b) ***Operating Fee.*** The Lessee must pay an operating fee as described below:

(1) **Initial Operating Fee Payment.**

The Lessee must pay an initial prorated operating fee within 90 days after the COD. The initial operating fee payment covers the first year of Commercial Operations on the lease and will be calculated in accordance with subsection (4), below, using an operating fee rate of 0.02 and a capacity factor of 0.4.

(2) **Annual Operating Fee Payments.**

The Lessee must pay the operating fee for each subsequent year of Commercial Operations on or before each Lease Anniversary following the formula in subsection (4). The Lessee must calculate each operating fee annually subsequent to the initial operating fee payment using an operating fee rate of 0.02 through the operations period of the lease. The capacity factor of 0.4 will remain in effect until the Lease Anniversary of the year in which the Lessor adjusts the capacity factor.

(3) **Final Operating Fee Payment.**

The final operating fee payment is due on the Lease Anniversary prior to the End Date. The final operating fee payment covers the last year of Commercial Operations on the lease and will be calculated in accordance with the formula in subsection (4) below.

(4) **Formula for Calculating the Operating Fee in Year *t*.**

| $F_t$ | = | $M_t$ | * | H | * | $c_p$ | * | $P_t$ | * | $r_t$ |
|---|---|---|---|---|---|---|---|---|---|---|
| (annual operating fee) | | (nameplate capacity) | | (hours per year) | | (capacity factor) | | (power price) | | (operating fee rate) |

Where:

| | |
|---|---|
| t = | the year of Commercial Operations on the lease starting from each Lease Anniversary, where *t* equals 1 represents the year beginning on the Lease Anniversary prior to, or on, the COD. |
| $F_t$ = | the dollar amount of the annual operating fee in year *t*. |
| $M_t$ = | the nameplate capacity expressed in megawatts (MW) rounded to the nearest second decimal place in year *t* of Commercial Operations on the lease. The capacity calculation is a two-step process: (1) scaling each turbine's nameplate capacity in proportion to the number of days in the year that it is operational and (2) summing these scaled values across all turbines.<br><br>The value of $M_t$, reflecting the availability of turbines, will be determined based on the FDR or FIR. This value will be adjusted to reflect any changes to installed capacity approved by BOEM as of the date each operating fee payment is due, in accordance with the calculation in Equation 1, for each year of |

Commercial Operations on the lease.

$$(1)\ M_t = \sum_{w=1}^{W_t} \left( N_w \ x \left[ \frac{Y_{w,t}}{D} \right] \right)$$

Where:

$W_t$ = Number of individual wind generation turbines, *w*, that will be available for Commercial Operations during any day of the year, *t*, per the FDR or FIR.

$N_w$ = Nameplate capacity of individual wind generation turbine, *w*, per the FDR or FIR expressed in MW.

$Y_{w,t}$ = Number of days that turbine *w* is commercially available during year.

$D$ = Days in the year set equal to 365 in all years for purposes of this calculation.

$M_t$ may be reduced only in the event that installed capacity is permanently decommissioned. $M_t$ will not be changed in response to routine or unplanned maintenance of units, including the temporary removal of a nacelle for off-site repair or replacement with a similar unit.

EXAMPLE: Table 1 illustrates the calculations represented by Equation (1) for a single lease year for a lease on which the Lessee plans to erect six turbines, each with a nameplate capacity of 5 MW. Based on the days in each turbine's Commercial Operations period (column B), the exhibit shows the number of days during the year that the turbine is available for Commercial Operations. Dividing this value by 365 (column D) yields the percent of days during the year that the turbine is available for Commercial Operations (column E). For each turbine, the resulting percentage (column E) is multiplied by its nameplate capacity (column A) to calculate its scaled capacity for the year (column F). The individual values in column F are then summed across all six turbines to calculate total capacity (Mt).

**Table 1: Example of $M_t$ Calculations for Installation**

| Turbine | Nameplate Capacity ($N_w$) [A] | Days in Turbine's Commercial Operations Period [B] | Number of days available for Commercial Operations in year t ($Y_{w,t}$) [C] | Number of days in the Year [D] | Percent of days available for Commercial Operations $\left(\frac{Y_{w,t}}{D}\right)$ [E = C ÷ D] | Turbine capacity scaled based on percent of days in Commercial Operations $N_w \times \frac{Y_{w,t}}{D}$ [F = A × E] |
|---|---|---|---|---|---|---|
| #1 | 5 | January 1 to December 31 | 365 | 365 | 100% | 5.00 |
| #2 | 5 | January 1 to December 31 | 365 | 365 | 100% | 5.00 |
| #3 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #4 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #5 | 5 | October 1 to | 92 | 365 | 25.2% | 1.26 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | December 31 | | | | |
| #6 | 5 | December 1 to December 31 | 31 | 365 | 8.5% | 0.42 |
| Available capacity summed across all turbines: $M_t = \sum_{w=1}^{W_t} \left(N_w \times \left[\frac{Y_{w,t}}{D}\right]\right) = 14.21$ | | | | | | |

The same calculation would be performed for the lease during the decommissioning phase.

H = the number of hours in the year for billing purposes which is equal to 8,760 for all years of Commercial Operations on the lease.

$c_p$ = the "Capacity Factor" in Performance Period p, which represents the share of anticipated generation of the facility that is delivered to where the Lessee's facility interconnects with the electric grid (i.e. the Delivery Point) relative to its generation at continuous full power operation at the nameplate capacity, expressed as a decimal between zero and one. Performance Period ($p$) is the period of Commercial Operation Years ($t$) during which each year has the same capacity factor.

The initial Capacity Factor ($c_0$) will be set to 0.4.

The Capacity Factor will be subject to adjustment at the end of each Performance Period. After the sixth year of Commercial Operations on the lease has concluded, the Lessee will utilize data gathered from years two through six of Commercial Operations on the lease and propose a revised Capacity Factor to be used to calculate subsequent annual payments, as provided for in Table 2 below. A similar process will be conducted at the conclusion of each five-year Performance Period, thereafter.

**Table 2: Definition of Performance Periods[1]**

| Performance Period ($p$) | Commercial Operation Years ($t$) | Payments Affected by Adjustment | Capacity Factor ($c$) | |
|---|---|---|---|---|
| 0 (COD) | Not Applicable | Payments 1 to 7 | $c_0=0.4$ | -- |
| 1 | $t$ = 2 to 6 | Payments 8 to 12 | $c_1$ | $n_1=6$ |
| 2 | $t$ = 7 to 11 | Payments 13 to 17 | $c_2$ | $n_2=11$ |
| 3 | $t$ = 12 to 16 | Payments 18 to 22 | $c_3$ | $n_3=16$ |
| 4 | $t$ = 17 to 21 | Payments 23 to 27 | $c_4$ | $n_4=21$ |
| 5 | $t$ = 22 to 26 | Payments 28 to 32 | $c_5$ | $n_5=26$ |
| 6 | $t$ = 27 to 31 | Payments 33 through 37 (as applicable) | $c_6$ | $n_6=31$ |

**Adjustments to the Capacity Factor**

The Actual 5-year Average Capacity Factor ($Xp$) is calculated for each Performance Period after COD ($p > 0$) per Equation 2 below. $Xp$ represents the sum of actual, metered electricity generation in megawatt-hours (MWh) at the Delivery Point to the electric grid ($A_t$) divided by the amount of electricity generation in MWh that would have been produced if the facility operated continuously at its full, stated capacity ($M_t$) in all of the hours ($h_t$) in each year, $t$, of the corresponding five-year period.

1 The Lessor acknowledges that there is a potential scenario where the design and construction period under 585.235(a)(3) may significantly overlap commercial operations as defined in Section II of this Addendum "B". In the event that the payment schedule appears likely to extend beyond 37 payments, the Lessor will provide an updated payment schedule to the Lessee.

| | |
|---|---|
| | (2) $X_p = \frac{\sum_{t=n-4}^{n} A_t}{(\sum_{t=n-4}^{n} M_t \, x \, h_t)}$<br>Where:<br>$M_t$ = Nameplate Capacity as defined above.<br>*n* = "Date End Year" value for the Performance Period, *p*, as defined in Table 2.<br>*p* = Performance Period as defined in Table 2.<br>$A_t$ = Actual generation in MWh associated with each year of Commercial Operations, *t*, on the lease that is transferred at the Delivery Point; Delivery Point meter data supporting the values submitted for annual actual generation must be recorded, preserved, and timely provided to the Lessor upon request. The generation data for the facility must be the same data reported on the Energy Information Administration's EIA-923.<br>$h_t$ = Hours in the year on which the Actual Generation associated with each year of Commercial Operations, *t*, on the lease is based; this definition of "hours in the year" differs from the definition of H in the operating fee equation above. The hours in the year for purposes of calculating the capacity factor must take into account the actual number of hours, including those in leap years.<br>The value of the Capacity Factor at the outset of Commercial Operations ($p = 0$) is set to 0.4 as stated in equation 3:<br>**(3)** $c_0 = 0.4$ |
| $P_t$ = | a measure of the annual average wholesale electric power price expressed in dollars per MW hour.<br><br>The Lessee must calculate Pt at the time each operating fee payment is due, subject to approval by the Lessor. The Price ($P_t$) must equal the simple average of the "on-the-hour" spot price indices for the California Independent System Operator (California ISO] North of Path 15 (NP15) market hub price for the most recent calendar year of data available. Aggregated data from commercial subscription services such as S&P Global Market Intelligence Platform or Hitachi ABB Velocity Suite can also be used and may be posted by BOEM for reference.<br><br>The source of data used in the calculations must be noted in the Lessee's documentation supporting its estimate of the value of Pt each year for review and approval by the Lessor. BOEM will use the posted prices to verify the Lessee's calculations. |
| $r_t$ = | the operating fee rate of 0.02 (2%). |

### (c) Reporting, Validation, Audits, and Late Payments.

The Lessee must submit the values used in the operating fee formula to the Lessor at the time the annual payment based on these values is made. Submission of this and other reporting, validation, audit and late payment information as requested by the Lessor must be sent to the Lessor using the contact information indicated in Addendum "A", unless the Lessor directs otherwise. Failure to submit the estimated values and the associated documentation on time to the Lessor may result in penalties as specified in applicable regulations.

Within 60 days of the submission by the Lessee of the annual payment, the Lessor will review the data submitted and validate that the operating fee formula was applied correctly. If the Lessor validation results in a different operating fee amount, the amount of the annual operating fee payment will be revised to the amount determined by the Lessor.

The Lessor also reserves the right to audit the meter data upon which the Actual 5-year Average Capacity Factor is based at any time during the lease term. If, as a result of such audit, the Lessor determines that any annual operating fee payment was calculated incorrectly, the Lessor has the right to correct any errors and collect the correct annual operating fee payment amount.

If the annual operating fee is revised downward as a result of the Lessee's calculations, as validated by the Lessor, or an audit of meter data conducted by the Lessee or Lessor, the Lessee will be refunded the difference between the amount of the payment received and the amount of the revised annual operating fee, without interest. Similarly, if the payment amount is revised upward, the Lessee is required to pay the difference between the amount of the payment received and the amount of the revised annual operating fee, plus underpayment interest on the balance, in accordance with 30 CFR § 1218.54.

Late operating fee payments will be charged underpayment interest in accordance with 30 CFR § 1218.54.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "C"**

LEASE-SPECIFIC TERMS, CONDITIONS, AND STIPULATIONS

Lease Number OCS-P 0565

The Lessee's rights to conduct activities on the leased area are subject to the following terms, conditions, and stipulations. The Lessor reserves the right to impose additional terms and conditions incident to the future approval or approval with modifications of plans, such as a Site Assessment Plan (SAP) or Construction and Operations Plan (COP).

**Table of Contents**

1 DEFINITIONS ........ C-3
2 SITE CHARACTERIZATION ........ C-4
2.1 Survey Plan(s) ........ C-4
2.2 Pre-Survey Meeting(s) with the Lessor ........ C-5
3 REPORTING ........ C-5
3.1 Progress Report ........ C-5
4 NATIONAL SECURITY AND MILITARY OPERATIONS ........ C-9
4.1 Hold and Save Harmless ........ C-9
4.2 Evacuation or Suspension of Activities ........ C-9
4.3 Electromagnetic Emissions ........ C-10
4.4 Foreign Interest ........ C-10
4.5 Notice of Assignment to the Committee on Foreign Investment in the United States ........ C-11
5 STANDARD OPERATING CONDITIONS ........ C-11
5.1 General Requirements ........ C-11
5.2 Survey Operations Survey Operations and Meteorological and/or Oceanographic Buoy Deployment, Maintenance and Removal ........ C-12
5.3 Site-Specific Spill Prevention and Response Plan ........ C-13
5.4 Critical Operations and Curtailment Plan (COCP) ........ C-13
5.5 Anchoring Plan ........ C-14
5.6 Plan Review and Coordination ........ C-14
5.7 Avoiding Bottom Contact in Certain Areas ........ C-14
5.8 Marine Trash and Debris Prevention ........ C-15
5.9 Research Site Access ........ C-15
5.10 Endangered Species Act Consultation for Biological Surveys ........ C-15
5.11 Geological and Geophysical Survey Requirements ........ C-15

5.12 Avian and Bat Survey and Reporting Requirements ..... C-16
6 COMMERCIAL FISHERIES ..... C-17
6.1 Minimizing Conflicts ..... C-17
6.2 Fisheries Communications Plan ..... C-17
6.3 Fisheries Liaison ..... C-18
6.4 Notice and Reporting ..... C-18
6.5 Dock Space ..... C-18
6.6 Obstacles and Entanglements ..... C-18
7 ARCHAEOLOGICAL SURVEY REQUIREMENTS ..... C-18
7.1 No Impact without Approval ..... C-18
7.2 Archaeological Survey Required ..... C-18
7.3 Qualified Marine Archaeologist ..... C-19
7.4 Tribal Pre-Survey Meeting ..... C-19
7.5 Geotechnical Exploration ..... C-19
8 PROJECT LABOR AGREEMENTS ..... C-21
8.1 Project Labor Agreements ..... C-21
9 SITING CONDITIONS ..... C-21
9.1 Surface Structure Layout and Orientation ..... C-21
10 SUPPLY CHAIN STATEMENT OF GOALS ..... C-21
11 WORKFORCE TRAINING AND/OR SUPPLY CHAIN DEVELOPMENT BIDDING CREDIT ..... C-22
11.1 General Requirements and Restrictions ..... C-22
11.2 Documentation ..... C-26
11.3 Enforcement ..... C-27
12 LEASE AREA USE COMMUNITY BENEFIT AGREEMENT (CBA) BIDDING CREDIT ..... C-27
12.1 General Requirements and Restrictions ..... C-27
12.2 Documentation ..... C-29
12.3 Enforcement ..... C-29
13 GENERAL COMMUNITY BENEFIT AGREEMENT BIDDING CREDIT ..... C-29
13.1 General Requirements and Restrictions ..... C-29
13.2 Documentation ..... C-31
13.3 Enforcement ..... C-31

# 1 DEFINITIONS

**1.1** Definition of "Archaeological Resource": The term "Archaeological Resource" has the same meaning as "archaeological resource" in the Bureau of Ocean Energy Management (BOEM) regulations provided in 30 CFR 585.113.

**1.2** Definition of "Effective Date": The term "Effective Date" has the same meaning as "effective date" in BOEM regulations provided in 30 CFR 585.237.

**1.3** Definition of "Days": Unless otherwise specified, the term "days" means calendar days.

**1.4** Definition of "Geological and Geophysical Survey (G&G Survey)": The term "G&G Survey" serves as a collective term for surveys that collect data on the geology of the seafloor and landforms below the seafloor. High resolution geophysical surveys and geotechnical (sub-bottom) exploration are components of G&G surveys.

**1.5** Definition of "Geotechnical Exploration": The term "Geotechnical Exploration," also referred to as "Sub-bottom Sampling," or "Geotechnical Testing," is used to collectively refer to acquiring site-specific sediment and underlying geologic data acquired from the seafloor and the sub-bottom and includes geotechnical surveys utilizing deep borings, vibracores, and cone penetration tests.

**1.6** Definition of "High Resolution Geophysical Survey (HRG Survey)": The term "HRG Survey" means a marine remote-sensing survey using, but not limited to, such equipment as side-scan sonar, magnetometer, shallow and medium (seismic) penetration sub-bottom profiler systems, narrow beam or multibeam echo sounder, or other such equipment employed for the purposes of providing data on geological conditions, identifying shallow hazards, identifying archaeological resources, charting bathymetry, and gathering other site characterization information.

**1.7** Definition of "Protected Species": The term "Protected Species" includes marine mammals (those protected under the Endangered Species Act and those protected under the Marine Mammal Protection Act) and sea turtles.

**1.8** Definition of "Site Assessment Activities": The term "site assessment activities" or "site assessment," has the same meaning as "site assessment activities" in 30 CFR 585.113.

**1.9** Definition of "Qualified Marine Archaeologist": The term "Qualified Marine Archaeologist" means a person retained by the Lessee who meets the Secretary of the Interior's Professional Qualifications Standards for Archaeology (48 FR 44738–44739) and has experience analyzing and interpreting marine geophysical data.

**1.10** Definition of "Regional Lessees": The term "Regional Lessees" refers to Lessees who own leases in the same region. At the time of lease issuance, two regions exist offshore California, the North Coast Region and the Central Coast Region. The California North Coast Region includes leases OCS-P 0561 and OCS-P 0562 and the

California Central Coast Region includes leases OCS-P 0563, OCS-P 0564, and OCS-P 0565. The Lessor may amend the regions at the Lessor's discretion if, for example, conditions change.

## 2 SITE CHARACTERIZATION

**2.1** **Survey Plan(s)**: Prior to conducting each physical, biological, or cultural resources survey in support of the submission of a SAP or COP, the Lessee must submit to the Lessor a survey plan. Each distinct survey effort (*e.g.*, mobilization) must be addressed by a survey plan, although a single survey plan may cover more than one survey effort and may cover multiple types of activities (*e.g.*, geotechnical and geophysical surveys on lease and along cable routes).

Each survey plan must include details of activities to be conducted and timelines of each survey effort necessary to support the submission of a SAP or COP (*i.e.*, necessary to satisfy the information requirements in the applicable regulations, including, but not limited to, 30 CFR 585.606, 610, 611, 621, 626, 627, et al.). The Lessor will not accept survey plans that do not provide sufficient detail for review, including, but not limited to, specific description and illustration of the geographic areas to be surveyed, specific discussion of the survey methods and equipment to be employed, and a schedule of survey activities.

The Lessee must demonstrate compliance with each of the lease stipulations in Section 3 of Addendum "C" and include any waiver requests in its initial survey plan. Each survey plan must be consistent with the Lessee's Native American Tribes Communications Plan (NATCP) (see Addendum "C," Section 3.1.2), Agency Communications Plan (ACP) (see Addendum "C," Section 3.1.3), and Fisheries Communications Plan (FCP) (see Addendum "C," Section 6.2), and must include a description of the Lessee's intentions to coordinate with the U.S. Coast Guard (USCG) to prepare a Notice to Mariners for the specific survey activities described in the survey plan.

The Lessee must submit a survey plan to the Lessor at least 90 calendar days prior to commencement of any survey activities described in the survey plan. Within 30 calendar days from receipt, the Lessor may request the Lessee modify the survey plan to address any comments the Lessor submits to the Lessee on the contents of the survey plan. Comments must be addressed by the Lessee in a manner deemed satisfactory by the Lessor prior to commencement of the survey activities. If the Lessor does not respond with comments or objections within 30 calendar days of receipt of the survey plan, the Lessee may proceed with the survey activities per the proposed schedule. The lack of Lessor comment or objection to the survey plan does not ensure acceptance of the survey results with the SAP and/or COP.

**2.2 <u>Pre-Survey Meeting(s) with the Lessor</u>**: If requested by the Lessor, the Lessee must hold a pre-survey meeting with the Lessor prior to the commencement of survey activities to discuss the applicable survey plan. The Lessee must ensure the presence at this meeting of all relevant subject matter experts, as requested by the Lessor.

## 3 REPORTING

**3.1 <u>Progress Report</u>**: The Lessee must submit to the Lessor a progress report every six months (unless the Lessor directs otherwise) during all lease periods until the date of COP approval (if a COP is approved) that includes a brief narrative of the overall progress since the last progress report, or—in the case of the first report—since the Effective Date. Within 60 calendar days from receipt, the Lessor may request the Lessee modify the progress report to address any comments the Lessor submits to the Lessee on the contents of the document. The Lessee must address comments in a manner deemed satisfactory by the Lessor. If the Lessee does not address the comments provided by the Lessor in a timely and adequate manner, BOEM reserves the right to require specific actions, such as, but not limited to, third-party verification/mediation at the Lessee's expense, adjustment of required reporting frequency, or designation that the lease is not in good standing.

The progress report must:

- Identify Tribal Governments (Tribes) and parties with whom the Lessee made reasonable efforts to engage under Addendum "C," Section 3.1.1 below, on elements of the Lessee's project development, including, but not limited to, plans required by BOEM (*i.e.*, survey plan, SAP, COP) and workforce planning;
- Document, and update for subsequent reports, engagement with Tribes and parties since the previous reporting period;
- Document potential adverse effects from the Lessee's project to the interests of Tribes and parties;
- Document how, if at all, the design or implementation of the project has been informed by or altered to address these potential effects (including by investing in, or directing benefits to, Tribes and parties);
- Include a description of any anticipated or scheduled engagement activities for the next reporting period;
- Include feedback from engagement with Tribes and parties regarding transmission planning, prior to proposing any export cable route;
- Provide information that can be made available to the public and posted on the BOEM website; and
- Include strategies to reach individuals with Limited English Proficiency who may be affected by future offshore wind development.

The intent of this requirement is to improve Lessee communication and transparency with affected Tribes, parties, and members of the public, and to encourage lessees to identify and engage with underserved communities, including

those described in Executive Order 12898 on environmental justice that may be disproportionately impacted by the Lessee's activities on the Outer Continental Shelf (OCS), in order to avoid, minimize, and mitigate potential adverse effects by, for example, investing in these communities.

BOEM will protect privileged or confidential information that the Lessee submits, as authorized by the Freedom of Information Act (FOIA), 30 CFR 585.114, or other applicable statutes. If the Lessee wishes to protect the confidentiality of information, the Lessee should clearly mark it "Contains Privileged or Confidential Information" and consider submitting such information as a separate attachment. BOEM will not disclose such information, except as required by FOIA. If your submission is requested under FOIA, your information will only be withheld if a determination is made that one of FOIA's exemptions to disclosure applies. Such a determination will be made in accordance with the Department's FOIA regulations and applicable law. Labeling information as privileged or confidential will alert BOEM to more closely scrutinize whether it warrants withholding. Further, BOEM will not treat as confidential aggregate summaries of nonconfidential information.

3.1.1 *Engagement*: Lessee engagement must allow for early and active information sharing, focused discussion of potential issues, and collaborative identification of solutions. The Lessee will make reasonable efforts to engage with Tribes and parties that may be potentially affected by the Lessee's project activities on the OCS, including, but not limited to:

- Coastal communities
- Commercial and recreational fishing industries and stakeholders
- Educational and research institutions
- Environmental and public interest non-governmental organizations
- Federal, state, and local agencies
- Tribes
- Mariners and the maritime industry
- Ocean users
- Submarine cable operators
- Underserved communities, as defined in Section 2 of Executive Order 13985

The Lessee will make reasonable efforts to implement the project in a manner that minimizes, mitigates, and/or redresses the project's adverse effects, if any, on Tribes and parties. The Lessee will engage in ways that minimize linguistic, technological, cultural, capacity, or other obstacles to parties. To facilitate engagement under this section, the Lessee should work collaboratively with Federal, state, and local governments, community leadership and organizations, and Tribes. The Lessee is strongly encouraged to work with Tribes and parties to develop specific efforts to increase groups' capacity to participate in the engagement activities described in this lease, for example, by creating working groups or formal agreements to monitor community impacts and implement community benefits.

The progress report must include a section with plans for how the Lessee will communicate with Tribal governments, agencies, and fisheries (see Addendum "C," Sections 3.1.2, 3.1.3, and 6.2). In addition to the plans, each progress report should provide updates on the progress of communication efforts with those and other affected stakeholder or ocean user groups during the reporting period (see Addendum "C," Section 3.1).

3.1.2 *Native American Tribes Communications Plan (NATCP)*: The Lessee must develop a publicly available NATCP that describes the strategies that the Lessee intends to use for communicating with Tribes that have cultural and/or historical ties to the Lease Area. The purpose of the NATCP is to ensure early and active information sharing, focused discussion about potential issues, and collaborative identification of solutions to ensure that Tribes have an early and active role in providing input to the Lessee before it makes decisions that may impact their cultural, economic, environmental, and other interests. The Lessee will work with the Lessor and the California Native American Heritage Commission, to identify Tribes that have cultural and/or historical ties to the Lease Area and invite those Tribes to participate in development of the NATCP. The Lessee must engage with these Tribes in the development of the NATCP in accordance with each Tribe's consultation policies, procedures, and/or preferences, if any, as indicated in writing by an authorized representative of a given Tribe's governing body.

The NATCP must include the contact information for an individual retained by the Lessee as its primary point of contact with Tribes (*i.e.*, a Tribal Liaison). The NATCP should include detailed information and protocols for regular engagement with Tribes including, but not limited to, the types of engagement activities (*e.g.*, one-on-one meetings, group meetings, open houses, open information sharing meetings, etc.); the frequency of proposed engagements/meetings (*e.g.*, monthly, quarterly, bi-annually, annually, etc.); meeting locations and/or virtual platforms; contact information (*e.g.*, telephone numbers, email addresses, website addresses, etc.); and notification procedures for the Tribal pre-survey meeting (see Addendum "C," Section 7.4). The plan should outline specific methods for engaging with Tribes and disseminating information related to planned activities in the Lease Area to the Tribes and a process for addressing and resolving disputes. The NATCP should also include protocols for the unanticipated discovery of any potential pre-contact archaeological resource(s) (see Addendum "C," Section 7.5.2).

The Lessee must provide the NATCP to the Lessor and Tribes for review and comment and host a meeting with the Lessor and all interested Tribes to discuss the NATCP. The Lessee must provide the NATCP and host the Tribal-Lessor meeting within 120 days of the lease Effective Date. The Lessee may request that the Lessor extend the 120-day deadline, and meetings may include multiple interested Tribes. If a Tribe wishes to participate in NATCP engagement opportunities, the Lessee should request that the Tribe designate a Tribal Representative to serve as the Tribe's primary point of contact for communicating with the Lessee. If a Tribe does not respond to outreach from the Lessee, the Lessee needs to continue to invite the Tribe

to participate in NATCP engagement opportunities until an authorized representative of the Tribe's governing body provides a written response notifying the Lessee or Lessor that the Tribe does not wish to participate in the development of the NATCP. If a Tribe does not wish to participate in the development of the NATCP as indicated in writing by an authorized representative of the Tribe's governing body, the Lessee is no longer required to include them in NATCP communications. Any subsequent revisions to the NATCP resulting from NATCP engagement must be submitted to the Lessor with supporting documentation.

3.1.3 *Agency Communications Plan (ACP)*: The Lessee must develop a publicly available ACP that describes the strategies that the Lessee intends to use for communicating with Federal, state, and local agencies (including harbor districts) with authority related to the Lease Area and should outline specific methods for engaging with and disseminating information to these agencies. The purpose of the ACP is to ensure early and active information sharing, focused discussion of potential issues, and collaborative identification of solutions in order to improve the quality and efficiency of various agency decision-making processes, and to promote the sustainable development of offshore wind energy projects. The ACP must include the contact information for an individual retained by the Lessee as its primary point of contact with agencies, (*i.e.*, an Agency Liaison). The ACP should include detailed information and protocols for regular engagement with permitting, planning, and resource agencies including, but not limited to, the types of engagement activities (*e.g.*, one-on-one meetings, interagency meetings, open information sharing meetings, etc.); the frequency of proposed engagements/meetings (*e.g.*, monthly, quarterly, bi-annually, annually, etc.); meeting locations and/or virtual platforms; and contact information (*e.g.*, telephone numbers, email addresses, etc.).

The Lessee must provide the ACP to the Lessor and other permitting, planning, and resource agencies with authority related to the Lease Area for review and comment and host a meeting with the Lessor and all interested agencies to discuss the ACP. The Lessee must provide the ACP and host the meeting within 120 days of the Lease Effective Date. The Lessee may request the Lessor extend the 120-day deadline and meetings may include multiple agencies. The Lessee must invite agencies with planning and/or permitting roles and/or resource expertise to participate in the ACP. The Lessee should request that the agency designate a primary point of contact for communicating with the Lessee. If an agency states in writing to the Lessee or Lessor that it does not wish to participate in the ACP, the Lessee need no longer include that agency in ACP communications and must document this change in the ACP. If an agency does not respond to outreach from the Lessee, the Lessee will continue to invite the agency to participate in ACP engagement opportunities until the agency provides a response. Note that a decision to not participate in the ACP in no way changes the agency's regulatory authority or the need to communicate with that agency. Any subsequent revisions to the ACP resulting from engagement with participating agencies must be submitted to the Lessor with supporting documentation.

3.1.4 *Coordinated Engagement*: To the maximum extent practicable, the Lessee must coordinate engagement activities with other regional lessees and document its activities in its progress reports. Lessees must design coordinated engagement activities to decrease the communication and consultation burden on Tribes and parties. BOEM appreciates that not all engagement can be coordinated.

3.1.5 *Survey Reporting*: The progress report must include an update regarding progress in executing the activities included in the survey plan(s) (see Addendum "C," Section 2.1).

3.1.6 *Meteorological and/or Oceanographic Buoy Deployment*: The progress report must include an update on any meteorological and/or oceanographic buoy deployment planned or undertaken within the leased area including confirmation of the measures the Lessee took, or will take, to satisfy the conditions of any applicable lease stipulations.

## 4 NATIONAL SECURITY AND MILITARY OPERATIONS

**4.1 Hold and Save Harmless**: Whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the Lessee assumes all risks of damage or injury to persons or property, which occur in, on, or above the OCS, to any persons or to any property of any person or persons in connection with any activities being performed by the Lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors, or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs or activities of the individual military command headquarters (hereinafter "the appropriate command headquarters") listed in the contact information provided as an enclosure to this lease.

Notwithstanding any limitation of the Lessee's liability in Section 9 of the lease, the Lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of its officers, agents, or employees. The Lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury in connection with the programs or activities of the command headquarters, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

**4.2 Evacuation or Suspension of Activities**:

4.2.1 *General*: The Lessee hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations and/or require evacuation on this lease in the interest of national security, including space launch and homeland defense operations, pursuant to Section 3(c) of this lease.

4.2.2 *Notification*: Every effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate. Advance notice will normally be given before requiring a suspension or evacuation. Temporary suspension of operations may include, but is not limited to, the evacuation of personnel and appropriate sheltering of personnel not evacuated. "Appropriate sheltering" means the protection of all Lessee personnel for the entire duration of any Department of Defense (DoD) activity from flying or falling objects or substances and will be implemented by an order (oral and/or written) from the BOEM Pacific Regional Director, after consultation with the appropriate command headquarters or other appropriate military agency, or higher Federal authority. The appropriate command headquarters, military agency, or higher authority will provide information to allow the Lessee to assess the degree of risk to, and provide sufficient protection for, the Lessee's personnel and property.

4.2.3 *Duration*: Suspensions or evacuations for national security reasons will not generally exceed seventy-two (72) hours; however, any such suspension may be extended by order of the BOEM Pacific Regional Director. During such periods, equipment may remain in place, but all operations, if any, must cease for the duration of the temporary suspension if so directed by the BOEM Pacific Regional Director. Upon cessation of any temporary suspension, the Pacific Regional Director will immediately notify the Lessee that such suspension has terminated and operations on the leased area can resume.

4.2.4 *Lessee Point-of-Contact for Evacuation/Suspension Notifications*: The Lessee must inform the Lessor of the persons/offices to be notified to implement the terms of Addendum "C," Sections 4.2.2 and 4.2.3.

4.2.5 *Coordination with Command Headquarters*: The Lessee must establish and maintain early contact and coordination with the appropriate command headquarters, in order to avoid or minimize the potential to conflict with, and minimize the potential effects of conflicts with, military operations.

4.2.6 *Reimbursement*: The Lessee is not entitled to reimbursement for any costs or expenses associated with the suspension of operations or activities or the evacuation of property or personnel in fulfillment of the military mission in accordance with Addendum "C," Sections 4.2.1 through 4.2.5 above.

**4.3 Electromagnetic Emissions**: The Lessee, prior to entry into any designated defense operating area, warning area, or water test area, for the purpose of commencing survey activities undertaken to support SAP or COP submittal must enter into an agreement with the commander of the appropriate command headquarters to coordinate the electromagnetic emissions associated with such survey activities. The Lessee must ensure that all electromagnetic emissions associated with such survey activities are controlled as directed by the commander of the appropriate command headquarters.

**4.4 Foreign Interest**: It is a priority for the DoD and Lessor to protect national defense

capabilities and military operations, including military installations, research, development, test and evaluation activities, and military readiness activities from compromise and exploitation that may occur due to an activity under foreign control operating in the vicinity of those national defense capabilities and military operations. To further these goals, Lessee must provide the following information to the DoD contacts listed in this lease's Contact Information for Reporting Requirements (see enclosure) at least 14 days before taking any actions in the Lease Area:

- The names of entities or persons having a direct ownership interest in the facility, and changes in ownership interests.
- The names of the material vendors, entities, and persons with which the Lessee will potentially execute contracts to perform construction, supply turbines or other components, or conduct construction and operational activities at the facility.
- The names of any foreign entities and persons (as those terms are defined at 31 CFR 800.220 and 31 CFR 800.224) being allowed to access the wind turbine structures and associated data systems.

Any security concerns identified by the DoD during its review of information provided about potential foreign interests pursuant to this stipulation must be resolved before the Lessee allows access to the Lease Area to any foreign persons or representatives of foreign entities or uses wind turbines or other permanent on-site equipment manufactured by such an entity.

**4.5 Notice of Assignment to the Committee on Foreign Investment in the United States (CFIUS)**: If a prospective assignee is a foreign national or foreign-controlled business entity, the assignor and the proposed assignee must jointly provide notice of the proposed transaction to CFIUS in accordance with applicable regulations (subpart D of 31 CFR part 800) and provide a copy of the notice to the DoD. Nothing in this lease prohibits or limits the DoD from submitting objections to CFIUS about the transaction, nor limits DoD's communications with CFIUS during national security reviews and investigations, and during any mitigation, tracking, and post-consummation monitoring and enforcement, pursuant to applicable statutes and regulations. Approval of any assignment of lease interest that is subject to this stipulation may conclude only after, in addition to other applicable requirements for assignment, CFIUS provides notice that it has concluded all action under section 721 of the Defense Production Act of 1950, as amended, with respect to the assignment.

## 5 STANDARD OPERATING CONDITIONS

### 5.1 General Requirements:

5.1.1 *Communications Briefing*: Prior to conducting each physical, biological, or cultural resources survey, the Lessee must hold a briefing to establish responsibilities of each involved party, define the chains of command, discuss communication procedures, provide an overview of monitoring procedures, and review operational procedures.

This briefing must include all relevant personnel, crew members, and Protected Species Observers (PSOs). New personnel must be briefed as they join the work in progress.

5.1.2 *Communicating Mitigation Measures*: The Lessee must ensure that a copy of Addendum "C" and applicable sections of measures found in the *Endangered Species Act Section 7(a)(2) Concurrence Letter and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the Bureau of Ocean Energy Management's Offshore Wind Lease Issuance, Site Characterization and Assessment for the Morro Bay and Humboldt Wind Energy Areas* ("2022 ESA Concurrence Letter and EFH Response") issued by the National Marine Fisheries Service (NMFS) on September 21, 2022, and in Appendix D of the *Final Environmental Assessment on Commercial Wind Lease and Grant Issuance and Site Assessment Activities on the Pacific Outer Continental Shelf, Morro Bay Wind Energy Area, California* ("Morro Bay Environmental Assessment") are made available on every project-related vessel. The 2022 ESA Concurrence Letter and EFH Response may be found at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/LOC-EFH%20for%20OSW%20leases%20in%20CA.pdf. The Lessee must ensure that these documents are reviewed with all appropriate personnel aboard every project-related vessel.

5.1.3 *Vessel Speed Requirements*: Vessels conducting lease characterization studies, surveys, metocean buoy installation, maintenance, or decommissioning, or any other survey activities must travel at speeds of no more than 10 knots during all related activities, including vessel transit.

5.1.4 *Safe Navigation*: The Lessee must take measures to ensure safe navigation through the Lease Area. Safe navigation may entail a number of actions including the submission of Local Notices to Mariners to the appropriate USCG district to describe marine operations and following the guidance provided in Navigation and Vessel Inspection Circular 01-19.

**5.2 Survey Operations and Meteorological and/or Oceanographic Buoy Deployment, Maintenance and Removal**: In addition to the requirements described in the 2022 ESA Concurrence Letter and EFH Response (https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/LOC-EFH%20for%20OSW%20leases%20in%20CA.pdf) and Morro Bay Environmental Assessment (Appendix D), the Lessee must include the following measures as part of any survey and meteorological and/or oceanographic buoy deployment, maintenance and removal:

5.2.1 *Marine Wildlife Protection and Monitoring Measures*: The Lessee must implement all marine wildlife protection and monitoring measures listed in Addendum "C," Sections 5.2.1.1 through 5.2.1.4 during all marine operations (*e.g.*, transits, surveys, buoy installation and removal), consistent with vessel and worker safety. Before beginning offshore activities associated with this lease, the Lessee must provide awareness training to all project-related personnel and vessel crew,

including viewing of an applicable wildlife and fisheries training video, on the most common types of marine wildlife likely to be encountered in the project area and the types of activities that have the most potential for affecting the animals.

5.2.1.1 *Protected Species Observers*: The Lessee must ensure that a minimum of one qualified third-party PSO is located on each vessel to conduct observations. The number of observers per vessel must be sufficient to ensure complete viewing coverage of the surrounding marine environment.

5.2.1.2 *Protected Species Observers' Equipment*: The Lessee must ensure that observers have the safety and monitoring equipment adequate to conduct their activities (including night-vision equipment for nighttime survey operations).

5.2.1.3 *Protected Species Observer Authority*: The Lessee must ensure that the observers have the authority to stop any activity that could result in harm to a protected species, except when the stopping of the activity would put the safety of the vessel or crew at risk. In the event that a marine mammal is struck by a vessel or survey equipment or becomes entangled in any cable or lines, the Lessee must ensure that the observer immediately notifies NMFS so that appropriate response measures can be implemented. Similarly, if the vessel or its crew causes any harassment or harm to a marine mammal occurs, the Lessee must ensure that the observer immediately notifies NMFS and any other required regulatory agency.

5.2.1.4 *Monitoring Reporting*: The Lessee must submit a final report summarizing the results of monitoring activities to BOEM, NOAA, and must also send a copy to the California Coastal Commission's Executive Director and other appropriate agencies no more than 90 days following yearly completion of survey activities. Yearly completion dates must be defined in the associated survey plan. The report must, at a minimum, include: (a) an evaluation of the effectiveness of monitoring protocols and (b) reporting of: (i) marine mammal, sea turtle, and other wildlife sightings (species and numbers); (ii) any wildlife behavioral changes; and (iii) any interactions or conflict with marine wildlife, including reporting of any project delays or cessation of operations due to the presence in the project area of marine wildlife species subject to protection.

**5.3** **Site-Specific Spill Prevention and Response Plan**: The Lessee must submit to BOEM a site-specific Spill Prevention and Response Plan a minimum of 30 days before commencing any maritime survey activities or as part of any survey plan or SAP. The Plan must be kept on the appropriate survey vessels during all survey and SAP operations. The Plan must identify the worst-case spill scenario and detail the availability of adequate spill response equipment. The Plan must also: include preventative measures the Lessee will implement to avoid spills; clearly identify responsibilities of onshore and offshore contractors and the Lessee's personnel; and list and identify the location of oil spill response equipment (including booms), appropriate protocols, and response times for deployment. Petroleum-fueled equipment on the main deck of all vessels must have drip pans or other means of

collecting dripped petroleum, which must be collected and treated with onboard equipment.

**5.4** **Critical Operations and Curtailment Plan (COCP)**: The Lessee must include a COCP as part of any survey plan. The COCP must define the limiting conditions of sea state, wind, or any other weather conditions that exceed the safe operation of offshore vessels, equipment, or divers in the water; that hinder potential spill cleanup; or in any way pose a threat to personnel or the safety of the environment. The COCP must provide for a minimum ongoing five-day advance weather forecast during offshore operations. The Plan must also identify the on-site personnel who have authority to determine critical conditions and suspend work operations when necessary. The COCP must be kept on the appropriate survey vessels during all survey and any meteorological and/or oceanographic buoy deployment, maintenance and removal operations.

**5.5** **Anchoring Plan**: The Lessee must submit an Anchoring Plan to BOEM as part of any survey plan that requires vessel anchoring. The Plan must describe how the Lessee will avoid placing anchors on sensitive ocean floor habitats, cables, and pipelines and must include the following information:

- A list of all vessels that will anchor during survey activities and the number and size of anchors to be set;
- Detailed maps showing proposed anchoring sites located at least 40 feet (12 meters) from hard substrate. The distance between the proposed anchoring sites and any hard substrate must be sufficient to fully protect the hard substrate from anchors and related infrastructure;
- A description of the navigation equipment that would be used to ensure anchors are accurately set; and
- Anchor handling procedures that would be followed to prevent or minimize anchor dragging, such as placing and removing all anchors vertically.

**5.6** **Plan Review and Coordination**: The Lessee must coordinate its survey plan and SAP submissions with the Lessor and the California Coastal Commission to ensure that the activities described in the survey plan and SAP submissions minimize impacts to coastal resources and that the submissions provide the data and information necessary for future consistency certifications, as appropriate. As part of this effort, the Lessee will:

a. Engage in continuous and open communication and dialogue with the Lessor, the Coastal Commission, and other relevant state agency staff during the Lessor's review of survey plans and SAPs.

b. Provide to the Coastal Commission access to the Lessee's survey plan submissions, unless BOEM determines, upon the Lessee's request for a determination, that any of the submissions are exempt from disclosure under FOIA (5 U.S.C. 552) and the regulations contained in 43 CFR part 2 (30 CFR 585.114).

c. Minimize impacts of geophysical and other surveys conducted during the Preliminary and COP Review Periods.

**5.7 Avoiding Bottom Contact in Certain Areas**: The Lessee must avoid intentional contact within hard substrate, rock outcroppings, seamounts, or deep-sea coral/sponge habitat, and include a buffer of at least 40 feet (12 meters) from hard substrates that fully protects these habitats from bottom contact, including, but not limited to, anchoring, mooring, and sediment sampling.

**5.8 Marine Trash and Debris Prevention**: The Lessee must ensure that vessel operators, personnel, and contractors actively engaged in activity in support of lease activities are briefed on marine trash and debris awareness and elimination, as described in Appendix D of the Morro Bay Environmental Assessment and the 2022 ESA Concurrence Letter and EFH Response.

**5.9 Research Site Access**: The Lessor, its designated representative, or any entity to which the Lessor provides access, retains the right to access, for research purposes, the site of any operation or activity conducted under this lease. The Lessor will make a good faith effort to provide prior notice of needs for access. This provision does not limit the Lessor's authority to access the lease for other purposes, including, but not limited to, inspections conducted pursuant to 30 CFR 285.822.

**5.10 Endangered Species Act Consultation for Biological Surveys**: BOEM has consulted with NMFS on biological surveys expected to occur on the Lease Area. If the Lessee intends to design and conduct biological surveys to support offshore renewable energy plans that could interact with ESA-listed species, the surveys must be within the scope of activities described in the 2022 ESA Concurrence Letter and EFH Response or the Lessee must consult further with BOEM and NMFS. Please see https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/LOC-EFH%20for%20OSW%20leases%20in%20CA.pdf for data collection activities that have been previously consulted upon. At the Lessee's option, the Lessee, its operators, personnel, and contractors may satisfy these survey requirements related to protected species by complying with the NMFS-approved measures to safeguard protected species that are most current at the time an activity is undertaken under this lease, including, but not limited to, new or updated versions of the 2022 ESA Concurrence Letter and EFH Response.

**5.11 Geological and Geophysical Survey Requirements**:

5.11.1 *Protected Species*: The Lessee must comply with the protective measures identified in the 2022 ESA Concurrence Letter and EFH Response (https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/LOC-EFH%20for%20OSW%20leases%20in%20CA.pdf). The Lessor will provide up-to-date information at the pre-survey meeting, during survey plan review, or at another time prior to survey activities as requested by the Lessee. At the Lessee's option, the Lessee, its operators, personnel, and contractors may satisfy

these survey requirements related to protected species by complying with the NMFS-approved measures to safeguard protected species that are most current at the time an activity is undertaken under this lease, including, but not limited to, new or updated versions of the 2022 ESA Concurrence Letter and EFH Response (https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/LOC-EFH%20for%20OSW%20leases%20in%20CA.pdf), or through new or activity-specific consultations.

5.11.2 *Low-Energy Equipment*: The Lessee must use low-energy equipment, as defined by California State Regulation 2 CCR § 2100.03(g), to complete its geophysical surveys. BOEM encourages the Lessee to use geophysical survey operators that conduct their surveys in compliance with the provisions of the California State Lands Commission's low-energy geophysical survey program.

**5.12 Avian and Bat Survey and Reporting Requirements:**

5.12.1 *Lighting*: Any lights used to aid marine navigation by the Lessee during construction, operations, and decommissioning of a meteorological buoy must meet USCG requirements for private aids to navigation (https://www.navcen.uscg.gov/sites/default/files/pdf/AIS/CG_2554_Paton.pdf) and BOEM's Guidelines for Lighting and Marking of Structures Supporting Renewable Energy Development (https://www.boem.gov/2021-lighting-and-marking-guidelines). For any additional lighting, the Lessee must use such lighting only when necessary, and the lighting must be hooded downward and directed when possible, to reduce upward illumination and illumination of adjacent waters.

5.12.2 *Motus Wildlife Tracking System*: To help address information gaps on offshore movements of birds and bats, including ESA-listed species, the Lessee must install Motus stations on meteorological or oceanographic data buoys in coordination with U.S. Fish and Wildlife Service's (USFWS) Offshore Motus network.

5.12.3 *Bird Deterrents*: To minimize the attraction of birds, the Lessee must install bird deterrent devices (*e.g.*, anti-perching), where appropriate.

5.12.4 *Avian Annual Reporting*: The Lessee must provide an annual report to both the Lessor and USFWS using the contact information provided as an Enclosure to this lease, or updated contact information as provided by the Lessor. This report must document any dead or injured birds or bats found during activities conducted in support of plan submittal. The first report must be submitted within 6 months of the start of the first survey conducted in support of plan submittal, and subsequent reports must be submitted annually thereafter until all surveys in support of plan submittal have concluded and all such birds and bats have been reported. If surveys are not conducted in a given year, the annual report may consist of a simple statement to that effect. An annual report must be provided to BOEM and USFWS documenting any dead (or injured) birds or bats found on vessels and structures during construction, operations, and decommissioning. The report must contain the following information: the name of species, date found, location, a picture to confirm

species identity (if possible), and any other relevant information. Carcasses with Federal or research bands must be reported to the United States Geological Survey Bird Band Laboratory, available at https://www.usgs.gov/labs/bird-banding-laboratory.

5.12.5 *Survey Results and Data*: The Lessee must provide the results of avian surveys and data to BOEM and USFWS with its plans.

## 6 COMMERCIAL FISHERIES

**6.1 Minimizing Conflicts:** The Lessee, operator(s), subcontractor(s), and all personnel involved in surveys and development will endeavor to minimize conflicts between the offshore wind industry and the commercial fishing industry.

The Lessee is strongly encouraged to participate in working group(s) consisting of state and Federal agencies, fishing organizations, and representatives formed to develop a statewide strategy for avoidance, minimization, and mitigation of impacts to fishing and fisheries that prioritizes fisheries productivity, viability, and long-term resilience.

Prior to submitting a COP to the Lessor, the Lessee will contact potentially affected commercial fishing communities or their representatives to discuss potential conflicts with the siting, timing, and methods proposed. Through this consultation, the Lessee will ensure that, whenever feasible, survey and development activities are compatible with seasonal fishing operations.

The Lessee must show in the proposed COP the marine vessel operation routes that will be used to minimize impacts to commercial fishing, marine mammals, and protected species.

Proposed mitigation measures in the COP will, to the extent practicable, prioritize Federal, Tribal, and state climate change adaptation strategies for fisheries.

**6.2 Fisheries Communications Plan**: The Lessee must develop a publicly available FCP that describes the strategies that the Lessee intends to use for communicating with commercial fishing communities prior to and during activities in support of the submission of a plan. The FCP must include the contact information for an individual retained by the Lessee as its primary point of contact with commercial fishing communities (*i.e.*, Fisheries Liaison) (see Addendum "C," Section 6.3). The FCP must also include the strategy and timing of discussions with commercial fishing communities regarding the reduction of conflicts with facility designs and marine vessel operations pursuant to lease stipulation 3.1.1 (see Addendum "C," Section 3.1.1).

The Lessee must provide the FCP to the Lessor and commercial fishing communities for review and comment and host a meeting with the Lessor and interested commercial fishing communities to discuss the FCP. The Lessee must provide the FCP and host the meeting within 120 days of the lease Effective Date. The Lessee

may request that the Lessor extend the 120-day deadline, and meetings may include multiple interested commercial fishing communities. Any subsequent revisions to the FCP resulting from FCP engagement must be submitted to the Lessor with supporting documentation.

The Lessee will make the FCP easily accessible to the public, including through a local "Notice to Mariners" and outreach to, *e.g.*, Fisheries Management Councils, newsletters, websites, Fisheries Liaison Officers and/or Fisheries Representatives (including Tribal Fisheries Departments), and applicable state agencies. The FCP must include a process to file a complaint with the offshore wind operator to seek the replacement of, or compensation for, lost gear.

**6.3** **Fisheries Liaison**: The Lessee must identify an independent Fisheries Liaison that is responsible for the coordination and communication of project activities with affected commercial, recreational, and subsistence fishing communities and harbor districts, including development and implementation of survey plans and SAPs. The Fisheries Liaison will work with fishing communities and harbor districts to coordinate survey and other activities and to develop a process for reporting and remediating conflicts between mariners and survey vessels/equipment. BOEM encourages the Lessee to coordinate with other lessees in the Region.

**6.4** **Notice and Reporting**: The Lessee is required to (i) notify applicable ocean users (including Tribal Fisheries Departments) two weeks in advance of any G&G survey activities, and (ii) provide an annual summary of filed complaint claims and outcomes to BOEM so it can better understand the frequency and extent of gear interactions.

**6.5** **Dock Space**: The Lessee must also include in the COP an analysis of the effects of its operations on the allocation and use of local dock space by fishing boats and project marine vessels. These analyses must address present uses, predicted project-dependent uses which increase the level of demand, and an assessment of individual and cumulative impacts.

**6.6** **Obstacles and Entanglements**: All activities associated with the preparation of the COP will, to the extent practicable, minimize the infrastructure spatial footprint and be conducted to avoid the creation of obstacles and entanglement hazards to commercial fishing operations. Anchoring patterns will be designed to minimize displacement area.

## 7 ARCHAEOLOGICAL SURVEY REQUIREMENTS

**7.1** **No Impact without Approval**: In no case may the Lessee knowingly impact a potential archaeological resource without the Lessor's consent provided following appropriate compliance with the National Historic Preservation Act.

**7.2** **<u>Archaeological Survey Required</u>**: The Lessee must provide to the Lessor, with its plans (*i.e.*, SAP and/or COP), and to Tribes identified in the NATCP, a description of the methods it plans to use to conduct an archaeological survey and the results of the archaeological survey.

**7.3** **<u>Qualified Marine Archaeologist</u>**: The Lessee must ensure that the analysis of archaeological survey data collected in support of plan (*i.e.*, SAP and/or COP) submittal and the preparation of archaeological reports in support of plan submittal are conducted by a Qualified Marine Archaeologist.

**7.4** **<u>Tribal Pre-Survey Meeting</u>**: The Lessee must coordinate a Tribal pre-survey meeting by sending a letter through certified mail to Tribes that have cultural and/or historical ties to the Lease Area and by sending subsequent emails or making phone calls, as necessary. The Lessee must work with the Lessor and the California Native American Heritage Commission to identify Tribes that have cultural and/or historical ties to the Lease Area. The Lessee must send notification of the Tribal pre-survey meeting at least 15 calendar days prior to the date of the proposed Tribal pre-survey meeting.

The purpose of this meeting is for the Lessee and the Lessee's Qualified Marine Archaeologist to discuss the Lessee's Survey Plan and consider requests to monitor portions of the archaeological survey and the geotechnical exploration activities, including the visual logging and analysis of geotechnical samples (*e.g.*, cores, etc.). The meeting must be scheduled for a date at least 30 calendar days prior to commencement of survey activities performed in support of plan submittal and at a location and time that affords the participants a reasonable opportunity to participate. The anticipated date for the meeting must be identified in the timeline of activities described in the applicable survey plan (see Addendum "C," Section 2.1). The Lessee must provide the Lessor with documentation of compliance with this stipulation prior to commencement of surveys.

**7.5** **<u>Geotechnical Exploration and Deployment of Meteorological and/or Oceanographic Buoy(s)</u>**: The Lessee may only conduct geotechnical exploration activities and/or deployment of any meteorological and/or oceanographic buoy(s) performed in support of plan (*i.e.*, SAP and/or COP) submittal in locations where an analysis of the results of geophysical surveys has been completed. This analysis must include a determination by a Qualified Marine Archaeologist as to whether any potential archaeological resources are present in the area. Except as allowed by the Lessor under Addendum "C," Section 7.1, the geotechnical exploration activities and/or deployment of any meteorological and/or oceanographic buoy(s) must avoid potential archaeological resources by a minimum of 50 meters (164 feet) or by the minimum avoidance distance prescribed by the Lessor as part of survey plan review, whichever is greater. The avoidance distance must be calculated by the Qualified Marine Archaeologist from the maximum discernible extent of the archaeological resource. A Qualified Marine Archaeologist must certify, in the Lessee's archaeological reports, that geotechnical exploration activities and/or deployment of any meteorological and/or oceanographic buoy(s) did not impact potential historic

properties identified as a result of the HRG surveys performed in support of plan submittal. In the event that the geotechnical exploration activities and/or deployment of any meteorological and/or oceanographic buoy(s) did impact potential historic properties identified in the archaeological surveys without the Lessor's prior approval, the Lessee must follow the procedures outlined in Addendum "C," Section 7.5.2 for post-review discoveries.

7.5.1 *Monitoring and Avoidance*: The Lessee must inform the Qualified Marine Archaeologist that he or she may elect to be present during HRG surveys and bottom-disturbing activities performed in support of plan (*i.e.*, SAP and/or COP) submittal to ensure avoidance of potential archaeological resources, as determined by the Qualified Marine Archaeologist (including bathymetric, seismic, and magnetic anomalies; side-scan sonar contacts; and other seafloor or sub-surface features that exhibit potential to represent or contain potential archaeological sites or other historic properties). In the event that the Qualified Marine Archaeologist states that he or she wishes to be present, the Lessee must reasonably facilitate the Qualified Marine Archaeologist's presence and provide the Qualified Marine Archaeologist the opportunity to inspect data quality.

7.5.2 *Unanticipated Discovery Clauses*: If the Lessee, while conducting geotechnical exploration or any other bottom-disturbing activities in support of plan (*i.e.*, SAP and/or COP) submittal and after review of the location by a Qualified Marine Archaeologist under Addendum "C," Section 7.3, discovers an unanticipated potential archaeological resource, such as the presence of a shipwreck (*e.g.*, a sonar image or visual confirmation of an iron, steel, or wooden hull, wooden timbers, anchors, concentrations of historic objects, piles of ballast rock) or evidence of a pre-contact archaeological site (*e.g.*, stone tools, pottery, or other pre-contact artifacts) within the project area, the Lessee must:

7.5.2.1 *Halting Activities in Discovery Area*: Immediately halt seafloor/bottom-disturbing activities within the area of discovery by a minimum of 50 meters (164 feet), and the avoidance distance must be calculated from the maximum discernible extent of the archaeological resource;

7.5.2.2 *Notification*: Notify the Lessor within 24 hours of discovery. If the unanticipated discovery is believed to represent a pre-contact archaeological resource, the Lessee will also refer to the NATCP (Addendum "C," Section 3.1.2) for additional guidance;

7.5.2.3 *Notification Report*: Notify the Lessor in writing via report to the Lessor within 72 hours of its discovery;

7.5.2.4 *Confidentiality*: Keep the location of the discovery confidential and take no action that may adversely impact the archaeological resource until the Lessor has made an evaluation and instructs the applicant on how to proceed; and

7.5.2.5 *Additional Investigations*: Conduct additional investigations, as directed by the Lessor, to determine if the resource is eligible for listing in the National Register of Historic Places (30 CFR 585.702(b)). The Lessor will direct the Lessee to conduct

such investigations if (1) the site has been impacted by the Lessee's project activities; or (2) impacts to the site or to the area of potential effect cannot be avoided. If investigations indicate that the resource is potentially eligible for listing in the National Register of Historic Places, the Lessor will inform the Lessee how to protect the resource or how to mitigate adverse effects to the site. If the Lessor incurs costs in protecting the resource, then, under Section 110(g) of the National Historic Preservation Act, the Lessor may charge the Lessee reasonable costs for carrying out preservation responsibilities under the OCS Lands Act (30 CFR 585.702(c-d)).

## 8 PROJECT LABOR AGREEMENTS

**8.1** **Project Labor Agreements**: The Lessee must make every reasonable effort to enter a Project Labor Agreement(s) (PLA) that covers the construction stage of any project proposed for the leased area, and that applies to all contractors.

## 9 SITING CONDITIONS

**9.1** **Surface Structure Layout and Orientation**: If the Lessee's lease area abuts a neighboring BOEM lease area, in its COP project design, the Lessee must endeavor to design a structure layout that contains two common lines of orientation across the adjacent leases (as described in Navigation and Vessel Inspection Circular 01-19).

## 10 SUPPLY CHAIN STATEMENT OF GOALS

**10.1** The Lessee must submit to the Lessor a Statement of Goals in which the Lessee describes any plans, including engagement with domestic suppliers, by the Lessee for contributing to the creation of a robust and resilient U.S.-based floating offshore wind supply chain. The Statement of Goals must include the Lessee's plans for investments in supply chain improvements, if any, to support the offshore wind industry, including investments in the following:

- Installation, downpipe, survey, and other vessels
- Port infrastructure related to floating offshore wind project component manufacturing and wind turbine assembly
- Grid upgrades
- Research and development
- Manufacturing of components and facilities, including assistance in converting onshore wind turbine manufacturing facilities to floating offshore wind turbine manufacturing facilities
- Supply chain architecture such as fabrication and assembly halls, port storage, laydown areas
- Lift cranes capable of installing floating foundations, towers, and nacelles quayside
- Dry docks and navigation channels
- Onshore and offshore docking and refueling stations for autonomous vehicles

- Workforce diversity, training, and development, including within underserved communities and Tribes
- Ensuring equal access to contracting opportunities, including to disadvantaged businesses[2] and wholly owned Tribal businesses

If a COP is approved, the Lessee must annually provide updates to the Lessor about the Lessee's progress in meeting these goals. This information may be included as part of the certification of compliance statement provided pursuant to 30 CFR 285.633(b).

The Lessee must submit a final report evaluating the Lessee's success in meeting these goals no later than the first Fabrication and Installation Report (FIR) submission. The Lessee must submit two versions of the Statement of Goals, updates, and final report, one of which does not contain confidential information, so that BOEM can make it publicly available.

## 11 WORKFORCE TRAINING AND/OR SUPPLY CHAIN DEVELOPMENT BIDDING CREDIT

**11.1** **General Requirements and Restrictions**: The Lessee has committed $22,353,846 for the benefit of workforce training and/or domestic supply chain development as part of its high bid (hereinafter, the "Contribution").[3] The Contribution must support workforce training programs for the U.S. floating offshore wind industry, development of a U.S. domestic supply chain for the floating offshore wind industry, or both. The Contribution for workforce training and/or domestic supply chain development can be made in support of existing programs, or for the establishment of new programs or incentives associated with the planning, design, construction, operation, maintenance, or decommissioning of U.S. floating offshore wind energy projects, or the manufacturing or assembling of their components, in the United States. The Contribution must be made by the Lessee, its parent company, or an Affiliated Entity.[4] The Lessee will meet this commitment in accordance with the conceptual strategy submitted with the Bidder's Financial Form (BFF).

---

[2] A disadvantaged business entity is at least 51% owned and controlled by a socially and economically disadvantaged individual or individuals.

[3] As used herein, "Contribution" means: (i) the direct transfer or payment of monetary funds; and (ii) establishment of non-refundable monetary commitments or guarantees (including, but not limited to, revolving funds, trusts, and loan guarantees).

[4] Per the definition described in the Final Sale Notice for Pacific Wind Lease Sale 1, BOEM considers two entities to be affiliated if:

(1) They own or have common ownership of more than 50 percent of the voting securities, or instruments of ownership or other forms of ownership, of another person (for the purpose identifying affiliated entities, "person" means any individual, firm, corporation, association, partnership, consortium, or joint venture (when established as a separate entity)). Such ownership of less than 10 percent of a person constitutes a presumption of non-control that BOEM may rebut.

(2) They own or have common ownership of 10 through 50 percent of the voting securities or instruments of ownership, or other forms of ownership, of another person, and BOEM determines that there is control upon consideration of the following factors:

Contributions must be made to one or more of the following: (i) private, public, or municipal corporations, companies, associations, or partnerships; counties, cities, or towns (as those terms are used in the California Government Code); or other legal entities organized under the laws of any State of the United States, the District of Columbia, the law of any federally recognized Tribe or federal law applying to Tribes, or the law of any territory or insular possession subject to U.S. jurisdiction; (ii) an Executive Agency of the United States as defined in section 105 of Title 5 of the U.S. Code with authority to accept the Contribution for the purposes for which the bidding credit is authorized; or (iii) a State of the United States or a political subdivision thereof or a federally recognized Tribe. Contributions cannot be made to the parent or affiliated entities of the Lessee or for purposes of directly or indirectly satisfying a purchase or work order of the Lessee.

Any benefits provided should not duplicate benefits or mitigation measures imposed on the Lessee through, or pursuant to, statutes other than the Outer Continental Shelf Lands Act (OCSLA).

The Lessee, its parent company, or its affiliated entities are not permitted to retain an ownership/equity interest in the entity receiving the Contribution, a discount to the market price for goods or services provided by the recipient, or other preferential treatment, but can purchase offshore wind goods or services from the recipient at market rates. The Contribution must be made no later than the submission of the Lessee's first Facility Design Report (FDR). No portion of the Contribution may be used to meet the requirements of any other bidding credits for which the Lessee qualifies.

11.1.1 *<u>Workforce Training Credit – Requirement and Restrictions</u>*: The Contribution for workforce training must result in a better trained and/or larger domestic floating offshore wind workforce that would provide for more efficient operations via an increase in the supply of fully trained personnel. Workforce training contributions must support the development of skills for the general workforce (*i.e.*, not only the developer's workers) used in the planning, design, construction, operation, maintenance, or decommissioning of floating offshore wind energy projects.

---

(i) The extent to which there are common officers or directors.
(ii) With respect to the voting securities, or instruments of ownership or other forms of ownership: The percentage of ownership or common ownership, the relative percentage of ownership or common ownership compared to the percentage(s) of ownership by other persons, if a person is the greatest single owner, or if there is an opposing voting bloc of greater ownership.
(iii) Operation of a lease, grant, or facility as defined in BOEM's regulations at 30 CFR 585.113.
(iv) The extent of other owners' participation in operations and day-to-day management of a lease, grant, or facility as defined in BOEM's regulations at 30 CFR 585.113.
(v) Other evidence of power to exercise control over or common control with another person.

(3) Regardless of any percentage of ownership or common ownership, they are relatives, either by blood or marriage.
(4) They are both direct, or indirect, subsidiaries of the same parent company.

Training of existing Lessee employees, Lessee contractors, or employees of affiliated entities will not qualify under this bidding credit. All offshore wind lessees must have the opportunity to hire individuals trained in programs that benefited from the Contribution. Trainees cannot be contractually required to enter into employment agreements with either the Lessee making the Contribution or the entity providing the training.

The workforce training must be provided in the United States and to citizens of the United States, nationals of the United States, or aliens lawfully admitted for permanent residence in the United States as defined in 8 U.S.C. 1101(a)(20). The training must be provided by any of the following:

- Private, public, or municipal corporations, companies, associations, partnerships; counties, cities, or towns (as those terms are used in the California Government Code); or other legal entities organized under the laws of any State of the United States, the District of Columbia, the law of any federally recognized Tribe or federal law applying to Tribes, or the law of any territory or insular possession subject to U.S. jurisdiction;
- An Executive Agency of the United States as defined in section 105 of Title 5 of the U.S. Code with authority to accept the Contribution for the purposes for which the bidding credit is authorized; or
- A State of the United States or a political subdivision thereof or a federally recognized Tribe.

Contributions to workforce training must be one or more of the following:

- Contributions toward union apprenticeships, labor management training partnerships, stipends for workforce training, or other technical training programs or institutions focused on providing skills necessary for the planning, design, construction, operation, maintenance, or decommissioning of floating offshore wind energy projects on the United States OCS.
- Contributions toward maritime training necessary for the crewing of vessels to be used for the construction, servicing, and/or decommissioning of floating offshore wind energy projects on the United States OCS.
- Contributions toward training workers in skills or techniques necessary to manufacture or assemble floating offshore wind components, subcomponents, or subassemblies. Examples of these skills and techniques include those in the areas of welding; floating offshore wind energy technology; hydraulic maintenance; braking systems; mechanical systems, including blade inspection and maintenance; or computers and programmable logic control systems.[5]
- Contributions toward Tribal workforce development programs or training for employees of wholly owned Tribal corporations that lead to the

[5] https://www.bls.gov/ooh/installation-maintenance-and-repair/wind-turbine-technicians.htm#tab-4

expeditious and orderly development of floating offshore wind energy projects on the United States OCS.

- Contributions toward training in any other job skills that the Lessee can demonstrate are necessary for the planning, design, construction, operation, maintenance, or decommissioning of floating offshore wind energy projects on the United States OCS.

11.1.2 *Domestic Supply Chain Credit – Requirement and Restrictions*: The Contribution must result in (i) overall benefits to the U.S. floating offshore wind supply chain available to all potential purchasers of offshore wind services, components, or subassemblies, not solely the Lessee's project; (ii) either the demonstrable development of new domestic capacity (including vessels) or the demonstrable buildout of existing capacity; or (iii) a more robust floating offshore wind domestic supply chain by reducing the upfront capital or certification cost for manufacturing offshore wind components, including the building of facilities, the purchasing of capital equipment, and the certifying of existing manufacturing or assembly facilities. Supply chain development Contributions can be made to programs supporting the development of the supply chain or can be direct Contributions or incentives for manufacturing or other services supporting the floating offshore wind industry.

Contributions to domestic supply chain development must be one or more of the following:

- Contributions supporting the development of a domestic supply chain for the floating offshore wind industry, including manufacturing of components and subassemblies and the expansion of related services.
- Contributions to domestic Tier 2[6] and Tier 3[7] floating offshore wind component suppliers, such as mooring line manufacturers, and domestic Tier 1[8] supply chain efforts, including quayside fabrication of floating foundations and assembly of floating towers.
- Contributions for technical assistance grants to help U.S. manufacturers re-tool or certify (*e.g.*, ISO-9001) for floating offshore wind manufacturing.
- Contributions for the development of Jones Act-compliant vessels for the construction, servicing, and/or decommissioning of floating offshore wind energy projects in the United States, including semi-submersible barges for use during quayside manufacturing, assembly, or installation.

[6] Tier 2: Subassemblies are the systems that have a specific function for a Tier 1 component. They may include subassemblies of a number of smaller parts, such as a pitch system for blades. Tier 2 manufacturers contract with Tier 1 suppliers as a subcontractor or vendor.

[7] Tier 3: Subcomponents are commonly available items that are combined into Tier 2 subassemblies, such as motors, bolts, and gears. Tier 3 manufacturers are typically vendors that provide components to Tier 2 suppliers.

[8] Tier 1 components examples include the primary offshore wind components such as the blades, nacelles, towers, foundations, and cables. Tier 1 components are the major products that are purchased by an offshore wind project developer, such as the wind turbine, foundation, or cables. Tier 1 suppliers are primary suppliers that contract directly with the project developer. Contributions for Tier 1 supply chain development can include infrastructure necessary for quayside manufacturing, fabrication, or assembly.

- Contributions to the purchase and installation of self-propelled modular transporter systems (SPMTs), lift cranes capable of installing foundations, towers, and nacelles quayside, and domestic mooring manufacturing facilities.
- Contributions to port infrastructure related to floating offshore wind component manufacturing and preparation of quayside manufacturing and assembly areas for the construction and deployment of floating foundations for, or other components of, offshore wind turbines.
- Contributions to establish a new or existing bonding support reserve or revolving fund available to all businesses providing goods and services to floating offshore wind energy companies, including disadvantaged businesses,[9] and/or wholly owned Tribal corporations.
- Other Contributions to supply chain development efforts that the Lessee can demonstrate further the manufacture of floating offshore wind components or subassemblies, or the provision of floating offshore wind services, in the United States.

**11.2** **Documentation**: The Contribution must be verifiable by BOEM. The documentation provided by the Lessee must contain and elaborate on the information specified in the conceptual strategy submitted with the BFF and must allow BOEM to objectively verify (i) the amount of the Contribution and the beneficiary(ies) of the Contribution; and (ii) compliance with the bidding credit criteria provided in Addendum "C," Sections 11.1, 11.1.1, and 11.1.2 of the lease. The Lessee must provide written documentation to BOEM demonstrating payment of the full Contribution to initiatives or programs supporting workforce development and/or the domestic supply chain, as provided in Addendum "C," Sections 11.1.1 and 11.1.2. The documentation must be submitted to BOEM no later than the submission of the Lessee's first FDR (showing fulfillment of the entirety of the Contribution).

The documentation must also describe how the funded initiative or program has advanced, or is expected to advance, U.S. floating offshore wind workforce training and/or supply chain development. The documentation must provide qualitative and/or quantitative information that includes the estimated number of trainees or jobs supported, and/or the estimated leveraged supply chain investment resulting or expected to result from the Contribution. If the Lessee's implementation strategy has changed from that in the conceptual strategy due to market needs or other factors, the Lessee must explain the changed approach. BOEM reserves the right to determine whether the conditions of the bidding credit have been satisfied.

At a minimum, the documentation must include:

- All written agreements between the Lessee and beneficiary(ies) of the Contribution, which must detail the amount of the Contribution and how they

[9] A disadvantaged business entity is at least 51% owned and controlled by a socially and economically disadvantaged individual or individuals.

will be used by the beneficiaries of the Contribution in order to satisfy the goals of the bidding credit for which the Contribution was made;
- All receipts documenting the amount, date, financial institution, and the account and owner of the account to which the Contribution was made; and
- Sworn statements by the entity that made the Contribution and the beneficiary(ies) of the Contribution, attesting that all information provided is true and accurate in the above documentation.

**11.3** **Enforcement**: BOEM reserves the right to determine that the bidding credit has not been satisfied if changes to the Lessee's conceptual strategy or its implementation, that occur after the auction, do not meet the criteria for the bidding credit described herein. The requirements and restrictions applicable to the bidding credit commitment described in Addendum "C," Sections 11.1, 11.1.1, and 11.1.2 bind the Lessee and any future assignee(s) of the Lease as per 30 C.F.R. 585.410. If BOEM determines that a Lessee or assignee has failed to satisfy the commitment at the time of the first FDR submission, or if a Lessee or assignee relinquishes or otherwise fails to develop the lease by the tenth anniversary date of lease issuance, the amount corresponding to the bidding credit awarded will be immediately due and payable to the Office of Natural Resources Revenue (ONRR) with interest from the date of lease execution. The interest rate will be the underpayment interest rate identified by ONRR. BOEM may, at its sole discretion, extend the documentation deadline beyond first FDR submission or the 10-year timeframe stated in this paragraph.

## 12 LEASE AREA USE COMMUNITY BENEFIT AGREEMENT (CBA) BIDDING CREDIT

**12.1** **General Requirements and Restrictions**: As committed to by the Lessee in the BFF, the Lessee must, no later than at the time the first FDR is submitted, execute a CBA with one or more communities, stakeholder groups, or Tribal entities whose use of the geographic space of the Lease Area, or whose use of resources harvested from that geographic space, is expected to be impacted by the Lessee's potential offshore wind development (hereinafter, in the context of the Lease Area Use CBA bidding credit, referred to as "impacted community"). The Lease Area Use CBA must:

- Be between the Lessee or its affiliated entity, or if appropriate, its assignee(s), and an impacted community;
- Specify how the impacted community's uses of the Lease Area or how the impacted community's use of resources harvested from the geographic space of the Lease Area is expected to be impacted by the Lessee's potential offshore wind development;
- Address impacts to the impacted community arising from lease development;
- Specify any monetary, material, or other benefits provided, or to be provided, by the Lessee to the impacted community, including any mitigation or other compensatory measures provided by the Lessee to the impacted community, such as the establishment of any special purpose funds and the mechanisms through which monies therein will be disbursed;

- Indicate the commitment of the parties to collaboration and resolution of issues. This commitment may be indicated by a statement that the parties will agree to mediation, a strategy for collaboration, or other type of plan describing how the parties will collaborate or resolve issues as needed;
- Describe communication methods, engagement methods, or educational opportunities for the impacted community; and
- Specify plans (or strategies) to mitigate potential impacts from the proposed development of the Lease Area on the impacted community.

Lessees must use best efforts to provide benefits at least commensurate to the value of the bidding credit received ($5,588,462). This may include both monetary and non-monetary benefits. Any benefits provided to the impacted community should not duplicate benefits or mitigation measures imposed on the Lessee through, or pursuant to, federal statutes other than OCSLA.

The Lease Area Use CBA may assist fishing and related industries (including Tribal fisheries) by supporting their resilience and ability to adapt to gear changes or any potential gear loss or damage, as well as any loss of income, or other similar potential impacts that may arise from the development of the Lease Area. The Lease Area Use CBA may include payments into a special purpose fund, such as payments to support gear changes, navigation technology improvements, and other efforts to improve safety and navigation, or to compensate the fishing and related industries whose use of the geographic space of the Lease Area is impacted by the Lessee's potential offshore wind development.

The Lessee will meet its Lease Area Use CBA commitment(s) in accordance with the conceptual strategy submitted with the BFF.

The Lessee may execute a Lease Area Use CBA with a single entity, which may be a coalition that represents the diverse interests and inclusive needs of more than one impacted community, or multiple entities, or multiple impacted communities, and may execute more than one Lease Area Use CBA. To qualify for the Lease Area Use CBA bidding credit, the Lessee must enter into a Lease Area Use CBA with an impacted community that is a:

- Private, public, or municipal corporation, company, association, or partnership; county, city, or town (as those terms are used in the California Government Code); or other legal entity organized under the laws of any State of the United States or the District of Columbia, the law of any federally recognized Tribe or federal law applying to Tribes, or the law of any territory or insular possession subject to U.S. jurisdiction;
- Federally recognized Tribe under 25 U.S.C. § 5131; or
- State of the United States or a political subdivision thereof.

No Lease Area Use CBA that makes a Lessee eligible for a bidding credit may include exclusivity or preferential clauses that prevent or disincentivize an impacted community from entering into such agreements with other lessees or potential

lessees. BOEM reserves the right to review Lease Area Use CBAs for such clauses. If an exclusivity or preferential clause exists in the Lease Area Use CBA or a related agreement, BOEM will rescind the bidding credit and commence the enforcement process as described in Addendum "C," Section 12.3. No portion of a Lease Area Use CBA, fund, or agreement used for this credit may be used to meet the requirements of any other bidding credit for which the Lessee qualifies. Any Lease Area Use CBA used to meet the requirements of this stipulation must be appropriate to the Lease Area described in Addendum "A" and may apply within a reasonable distance onshore.

Any dispute between the Lease Area Use CBA parties will be expected to be resolved without BOEM's involvement.

**12.2** **<u>Documentation</u>**: The Lessee must provide to BOEM a copy of the executed Lease Area Use CBA no later than at the time of the submission of the Lessee's first FDR. The documentation provided by the Lessee must contain and elaborate on the information specified in the conceptual strategy submitted with the BFF. The documentation must enable BOEM to objectively verify that the Lease Area Use CBA has met the requirements for the Lease Area Use CBA bidding credit, and that it is in compliance with the bidding credit criteria provided in Addendum "C," Section 12.1 above.

At a minimum, this documentation must include:

- All written agreements between the Lessee and the impacted community, including the executed Lease Area Use CBA;
- A description of work done with impacted communities, including the monetary and non-monetary commitments that reflect the value of the bidding credit received; and
- Sworn statements by the Lease Area Use CBA signatories or their assignees, attesting to the truth and accuracy of all the information provided in the above documentation.

**12.3** **<u>Enforcement</u>**: BOEM reserves the right to determine that the bidding credit commitment to execute a Lease Area Use CBA has not been satisfied because changes to the Lessee's conceptual strategy or its implementation, that occur after the auction, do not meet the criteria for the bidding credit described herein. The requirements and restrictions applicable to the bidding credit commitment described in Addendum "C," Section 12.1 bind the Lessee and any future assignee(s) of the lease as per 30 C.F.R. 585.410. If BOEM determines that a Lessee or assignee has failed to enter into a Lease Area Use CBA that satisfies the commitment by the Lessee's first FDR submission, or if a Lessee or assignee relinquishes or otherwise fails to develop the lease by the tenth anniversary date of lease issuance, the amount corresponding to the bidding credit awarded will be immediately due and payable to ONRR with interest from the date of lease execution. The interest rate will be the underpayment interest rate identified by ONRR. BOEM may, at its sole discretion,

extend the documentation deadline beyond the first FDR submission or the 10-year timeframe stated in this paragraph.

## 13 GENERAL COMMUNITY BENEFIT AGREEMENT BIDDING CREDIT

**13.1** **General Requirements and Restrictions**: As committed to by the Lessee in the BFF, the Lessee must, no later than at the time the first FDR is submitted, execute a General CBA with one or more communities, Tribes, or stakeholder groups that are expected to be affected by the potential impacts on the marine, coastal, and/or human environment (such as impacts on visual or cultural resources) from activities resulting from lease development that are not otherwise addressed by the Lease Area Use CBA (hereinafter, in the context of the General CBA bidding credit, referred to as "impacted community"). The General CBA must:

- Be between the Lessee or its affiliated entity, or, if appropriate, its assignee(s), and an impacted community;
- Specify how the impacted community is likely to be affected by the potential impacts on the marine, coastal, and/or human environment from activities resulting from lease development;
- Address impacts to the impacted community arising from lease development that are not addressed by a Lease Area Use CBA;
- Specify the monetary, material, or other benefits provided, or to be provided, by the Lessee to the impacted community, including any mitigation or other compensatory measures provided by the Lessee to the impacted community;
- Indicate commitment of the parties to collaboration and resolution of issues. This commitment may be indicated by a statement that the parties will agree to mediation, a strategy for collaboration, or other type of plan describing how the parties will collaborate or resolve issues as needed;
- Describe communication methods, engagement methods, or educational opportunities for the impacted community; and
- Specify plans (or strategies) to mitigate potential impacts from the proposed lease development on the impacted community.

Lessees must use best efforts to provide benefits commensurate to the value of the bidding credit received ($5,588,462). This may include both monetary and non-monetary benefits. Any benefits provided to the impacted community should not duplicate benefits or mitigation measures imposed on the Lessee through, or pursuant to, federal statutes other than OCSLA. For example, such benefits could include:

- Contributions to a community benefit fund whose purpose is to provide funds for infrastructure to impacted communities to alleviate impacts from the Lessee's project;
- Increased support to facilitate engagement in the process through which the lease will be developed; and

- Mitigating potential impacts to cultural viewsheds or potential impacts on marine and land species that are of significance to Tribal culture or impacted communities.

The Lessee will meet its General CBA commitment(s) in accordance with the conceptual strategy submitted with the BFF. The Lessee may execute a General CBA with a single entity, which may be a coalition that represents the diverse interests and inclusive needs of more than one impacted community, or with multiple entities, or with multiple impacted communities and may execute more than one General CBA. To qualify for the General CBA bidding credit, the Lessee must enter into a General CBA with an impacted community that is a:

- Private, public, or municipal corporation, company, association, or partnership; county, city, or town (as those terms are used in the California Government Code); or other legal entity organized under the laws of any State of the United States or the District of Columbia, the law of any federally recognized Tribe or federal law applying to Tribes, or the law of any territory or insular possession subject to U.S. jurisdiction;
- Federally recognized Tribe under 25 U.S.C. § 5131; or
- State of the United States or a political subdivision thereof.

No General CBA that makes a Lessee eligible for a bidding credit may include exclusivity or preferential clauses that prevent or disincentivize an impacted community from entering into such agreements with other lessees or potential lessees. BOEM reserves the right to review General CBAs for such clauses. If an exclusivity or preferential clause exists in the General CBA or a related agreement, BOEM will rescind the bidding credit and commence the enforcement process as described in Addendum "C," Section 13.3. No portion of a General CBA, fund, or agreement used for this credit may be used to meet the requirements of any other bidding credit for which the Lessee qualifies. Any General CBA used to meet the requirements of this stipulation must be appropriate to the Lease Area described in Addendum "A" and may apply within a reasonable distance onshore.

Any dispute between the General CBA parties will be expected to be resolved without BOEM's involvement.

**13.2** **Documentation**: The Lessee must provide to BOEM a copy of the executed General CBA no later than at the time of the submission of the Lessee's first FDR. The documentation provided by the Lessee must contain and elaborate on the information specified in the conceptual strategy submitted with the BFF. The documentation must enable BOEM to objectively verify that the General CBA has met the requirements for the General CBA bidding credit, and that it is in compliance with the bidding credit criteria provided in Addendum "C," Section 13.1 above.

At a minimum, this documentation must include:

- All written agreements between the Lessee and the impacted community, including the executed General CBA;
- A description of work done with impacted communities to reach monetary and non-monetary commitments that reflect the value of the bidding credit received; and
- Sworn statements by the General CBA signatories or their assignees, attesting to the truth and accuracy of all the information provided in the above documentation.

**13.3** **Enforcement**: BOEM reserves the right to determine that the bidding credit commitment to execute a General CBA has not been satisfied because changes to the Lessee's conceptual strategy or its implementation, that occur after the auction, do not meet the criteria for the bidding credit described herein. The requirements and restrictions applicable to the bidding credit commitment described in Addendum "C," Section 13.1 bind the Lessee and any future assignee(s) of the lease as per 30 C.F.R. 585.410. If BOEM determines that a Lessee or assignee has failed to enter into a General CBA that satisfies the commitment by the Lessee's first FDR submission, or if a Lessee or assignee relinquishes or otherwise fails to develop the lease by the tenth anniversary date of lease issuance, the amount corresponding to the bidding credit awarded will be immediately due and payable to ONRR with interest from the date of lease execution. The interest rate will be the underpayment interest rate identified by ONRR. BOEM may, at its sole discretion, extend the documentation deadline beyond the first FDR submission or the 10-year timeframe stated in this paragraph.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "D"**

PROJECT EASEMENT

Lease Number OCS-P 0565

This section includes a description of the Project Easement(s), if any, associated with this lease, and the financial terms associated with any such Project Easement(s). This section will be updated as necessary.

I. Rent

The Lessee must begin submitting rent payments for any project easement associated with this lease commencing on the date that BOEM approves the Construction and Operations Plan (COP) or modification of the COP describing the project easement. Annual rent for a project easement is $5.00 per acre per year or a minimum of $450.00 per year in accordance with 30 CFR § 585.507(a).

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

Lease Number OCS-P 0565

**CONTACT INFORMATION FOR REPORTING REQUIREMENTS**

The following contact information must be used for the reporting and coordination requirements specified in Addendum "C," Stipulation 4:

ATTN: Executive Director
Military Aviation and Installation Assurance Siting Clearinghouse
Office of the Assistant Secretary of Defense (Sustainment)
3400 Defense Pentagon, Room 5C646
Washington, DC 20301 – 3400

ATTN: Department of Defense West Coast Coordinator
Department of the Navy – Navy Region Southwest
750 Pacific Highway, OF1514
San Diego, CA 92132

All Other Reporting Requirements in Stipulation 7:

Bureau of Ocean Energy Management

Pacific Regional Office

Phone: (805) 384-6379

Email: renewableenergypocs@boem.gov

**ENCLOSURE**

I acknowledge and agree to the above amendments:

| | |
|---|---|
| Invenergy California Offshore LLC | The United States of America |
| Lessee | Lessor |
| DocuSigned by: James Shield BEE98D6DAE16435 | DOUGLAS BOREN Digitally signed by DOUGLAS BOREN Date: 2025.01.14 14:33:33 -08'00' |
| (Signature of Authorized Officer) | (Signature of Authorized Officer) |
| James Shield | Douglas P. Boren |
| (Name of Signatory) | (Name of Signatory) |
| Vice President | Regional Director |
| (Title) | (Title) |
| 1/13/2025 | 1/14/25 |
| (Date) | (Date) |

DS

LEGAL MR REVIEWED

# EXHIBIT B

**SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES AND INVENERGY CALIFORNIA OFFSHORE LLC**

This Settlement Agreement ("**Agreement**") is entered into as this 12th day of June, 2026 by and between the United States of America, acting through the United States Department of the Interior ("**DOI**"), and the United States Department of Justice ("**DOJ**" and collectively with the DOI, the "**United States**") and Invenergy California Offshore LLC ("**Invenergy**," and collectively, with the United States, the "**Parties**").

**WHEREAS,** on December 6th and 7th, 2022, DOI, acting through the Bureau of Ocean Energy Management ("**BOEM**"), held a lease sale under 43 U.S.C. § 1337(p) of the Outer Continental Shelf Lands Act ("**OCSLA**") for offshore wind energy development on 80,418 acres of the California Central Coast lease area;

**WHEREAS,** the winning bidder for Lease No. OCS-P 0565 was Invenergy California Offshore LLC;

**WHEREAS,** Invenergy California Offshore LLC successfully bid $111,769,231 for Lease No. OCS-P 0565 and deposited that amount into the United States Treasury, through DOI's Office of Natural Resources Revenue ("**ONRR**");

**WHEREAS**, BOEM fully executed Lease No. OCS-P 0565 with Invenergy California Offshore LLC with an effective date of June 1, 2023;

**WHEREAS**, Invenergy California Offshore LLC subsequently paid BOEM $723,762 in annual Lease payments and expended $26,895,451.48 for preliminary project development activities in support of the obligations under Lease No. OCS-P 0565;

**WHEREAS,** no construction activities have been undertaken on Lease No. OCS-P 0565 and Lease No. OCS-P 0565 has not been developed beyond the preliminary project development activities referenced above;

**WHEREAS,** BOEM and Invenergy California Offshore LLC later amended Lease No. OCS-P 0565 on January 14, 2025;

**WHEREAS,** Invenergy California Offshore LLC currently owns Lease No. OCS-P 0565;

**WHEREAS,** Invenergy California Offshore LLC forgoes the five-year suspension period set forth in 43 U.S.C. § 1334(a)(2)(B) and requests that Lease No. OCS-P 0565 be cancelled in accordance with the terms in this Agreement;

**WHEREAS,** the Department of War has raised classified national security concerns about development of offshore leases that were not known to BOEM at the time of lease issuance and that may have prevented the lease issuance if they had been considered;

**WHEREAS,** if this offshore wind project would have continued, BOEM would have issued to Invenergy California Offshore LLC an order to suspend construction and operations of this project indefinitely due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025;

**WHEREAS,** Invenergy California Offshore LLC could have claimed breach of contract in the event that such a suspension order was received and filed suit in the United States Court of Federal Claims;

**WHEREAS,** DOI has determined that cancelling Lease No. OCS-P 0565 is in the public interest because it will bring certainty to the status of Lease No. OCS-P 0565 and assist in preventing a national security threat;

**WHEREAS,** the United States has obtained the written approval of the authorized representative of the United States Acting Attorney General that pursuant to 28 U.S.C. § 2414, it is in the interest of the United States Department of Justice to authorize payment of a settlement amount of up to $111,769,231 via the Judgment Fund Branch at the United States Department of the Treasury's Bureau of the Fiscal Service to settle the potential lawsuit referenced above as a

compromise to avoid imminent litigation;

**WHEREAS,** the Parties desire to set forth the terms of their Agreement in writing.

**NOW THEREFORE,** in consideration of the mutual agreements, covenants, representations, warranties and releases set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. The Parties agree to the following definitions for the purposes of this Agreement:

A. The "**United States of America**" and/or "United States" shall be inclusive of DOJ, DOI, BOEM, ONRR, and including any and all agencies, officers, and employees therein.

B. "**Affiliate**" means any entity (including without limitation any corporation, company, partnership, limited liability company or group) that directly or indirectly through one or more intermediaries is controlled by Invenergy Investment Company LLC.

C. "**Eligible Expenditures**" means all and any amounts expended by Invenergy or any of its Affiliates for the development of Conventional Energy Projects in the United States, either through the direct payment of capital expenditures ("CAPEX") or through an equity contribution cash call made for the benefit of an entity, such entity thereafter applying the funds or security toward the development of a Conventional Energy Project in the United States.

D. "**Conventional Energy Projects**" means any investment in (i) oil & gas production, gathering, transportation, processing, storage or refining, (ii) liquefied natural gas, (iii) generation or transmission of non-renewable based electricity (including for the sake of clarity using natural gas combustion turbines in simple or

combined cycle) (iv) tank farms; (v) geothermal power projects, and, (vi) any infrastructures related to (i) – (v).

2. Invenergy agrees that Invenergy or its Affiliates shall make Eligible Expenditures in the amount of up to $111,769,231 on Conventional Energy Projects within the United States between January 1, 2026 and December 31, 2026. The settlement amount shall equal the amount of Eligible Expenditures made by Invenergy or its Affiliates in 2026 of up to $111,769,231 ("**Settlement Amount**"). Any shortfall in Invenergy's ability to make Eligible Expenditures in the full amount set forth in Paragraph 2 by December 31, 2026 shall not be deemed a breach by Invenergy of this Agreement nor a waiver of the DOI's obligation to request payment from the Judgment Fund for any such Eligible Expenditures submitted by Invenergy. Any Eligible Expenditures counted under this Agreement will not count towards Eligible Expenditures in settlement agreements for other offshore wind leases.

3. Invenergy will provide an unqualified accounting audit report by a third party and any supporting documentation (in the form of bank statements, receipts, invoices, filings or any other valid proof collectively, the "**Expenditure Support**") to the DOI's Assistant Secretary – Policy, Management, and Budget verifying that it has made Eligible Expenditures that satisfy the condition in Paragraph 2 ("**Expenditure Submission Date**"). DOI will assess the sufficiency of this documentation within five (5) business days of the Expenditure Submission Date. Invenergy will maintain all documentation relating to Eligible Expenditures for a period of three years during which DOI will have the right to request that documentation.

4. Within five (5) business days of DOI's determination of the sufficiency of the documentation in Paragraph 3, the United States will submit a request for payment of the Settlement Amount to the Judgment Fund Branch at the United States Department of the Treasury's Bureau of the Fiscal Service and the United States shall issue such payment from the Judgment

Fund within sixty (60) calendar days unless otherwise extended by mutual agreement of the Parties to this Agreement. Upon payment of the Settlement Amount by the Judgment Fund, Lease No. OCS-P 0565 shall be cancelled, effective immediately, and DOI will inform ONRR of the same.

5. To the extent Invenergy does not receive payment of the Settlement Amount within sixty (60) calendar days of the submission of request for payment, or within an extended time agreed upon as provided by Paragraph 4, Invenergy retains the right to bring any and all claims available to it under the law.

6. Covenant Not to Sue. Except as necessary to enforce this Agreement, and unless set forth otherwise in this Agreement, the United States and Invenergy agree that they will not bring, commence, institute, prosecute, or maintain any action at law, proceeding in equity, or any other claims for damages or any other relief whatsoever that relates to, arises from, or is based, in whole or in part, on Lease No. OCS-P 0565 after payment of the Settlement Amount set forth in Paragraph 4.

7. Release and Discharge. Upon the payment of the Settlement Amount set forth in Paragraph 4, each Party hereby releases and discharges the other Party from any and all claims, causes of action, liability, and damages, whether known or unknown, of any nature or type, that such Party has or may have against the other Party arising out of or in relation to Lease No. OCS-P 0565 or this Agreement, however, the United States reserves any claim based upon fraud.

8. No Admissions. Except as otherwise expressly stated herein, nothing in this Agreement constitutes an admission of any fact, or an admission of any liability, by the United States or Invenergy.

9. Public Disclosure and Non-Disclosure of Certain Information. The United States and Invenergy consent to the disclosure of this Agreement to the public, provided however, that neither the United States nor Invenergy shall make any public announcement regarding this

Agreement without review and consultation with the other Party as to the text of such announcement. Each Party shall keep confidential any non-public information with respect to the other Party that was exchanged as part of the requirements of this Agreement including but not limited to any Expenditure Support (collectively, the "**Confidential Information**"). Upon receipt of any Freedom of Information Act request for Confidential Information related to the Agreement, the United States shall promptly notify Invenergy and the Parties shall cooperate in good faith to prepare mutually acceptable redactions authorized under applicable laws prior to any release of such Confidential Information.

10. Voluntary Agreement/Advice of Counsel. The United States and Invenergy agree and declare that they have voluntarily agreed to this Agreement of their own free will and accord, acting upon their own volition, and after consulting with their legal counsel and advisors and without any degree of duress or compulsion.

11. Legal Fees. The United States and Invenergy will bear their own legal fees and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

12. Disclaimer of Reliance. Except as contained in this Agreement, the United States and Invenergy expressly disclaim reliance upon any facts, promises, undertakings or representations made by any other Party, any other Party's representative, or any other Party's attorney in the execution of this Agreement.

13. Consideration. The United States and Invenergy acknowledge that the provisions of this Agreement provide mutually sufficient consideration for this Agreement and its enforcement.

14. Binding Effect. This Agreement is binding on each Party and their successors, transferees, heirs, and assigns.

15. Entire Agreement/Merger and Modification. This Agreement constitutes the complete agreement between the United States and Invenergy, and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions among the United States and Invenergy, whether oral or written, with respect to Lease No. OCS-P 0565. This Agreement may not be amended or rescinded except by mutual written consent of all the Parties.

16. No Third-Party Beneficiaries. This Agreement is intended to be for the benefit of the Parties only. Except for Invenergy, and as otherwise expressly stated herein, this Agreement is not intended to confer upon any person who is not a Party hereto any rights or remedies hereunder, and no person other than the Parties hereto is entitled to rely on any representation, covenant, or agreement contained herein.

17. Laws, Jurisdiction, & Venue. This Agreement is governed by the laws of the United States. For purposes of construing this Agreement, this Agreement is deemed to have been drafted by both Parties to this Agreement and is not, therefore, to be construed against the United States or Invenergy for that reason in any subsequent dispute. The Parties agree that the appropriate United States court shall have exclusive jurisdiction over any action, suit, or proceeding arising out of or relating to this Agreement.

18. Enforceability. This Agreement must be signed by each and every Party to be enforceable against any Party. This Agreement is effective on the date of signature of the last signatory to the Agreement.

19. No Admission of Liability. The United States and Invenergy specifically deny any liability related to Lease No. OCS-P 0565. Further, subject to the execution and performance of the Agreement, Invenergy agrees that no liability or damages are attributable to the United States as the result of Lease No. OCS-P 0565, this Agreement, and/or the actions taken by the United States pursuant to this Agreement. This Agreement is being made purely upon a cooperative basis

by the United States and Invenergy to address certain matters identified hereto, and this Agreement, and/or any performance under this Agreement pursuant hereto, is not allowed to be used as evidence of liability of the United States and/or Invenergy in any suit or suits, claims, causes of action, or in any public comment whatsoever, except as necessary to enforce this Agreement.

20. Authority. The undersigned represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

21. Non-Appropriation. Nothing in this Agreement may be construed to commit a federal agency or official to expend funds not appropriated by Congress. Nothing in this Agreement may be interpreted as a commitment or requirement that DOI obligate funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable law or regulation.

22. Counterpart Execution. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

23. Fulfillment. This Agreement will be considered fulfilled when Lease No. OCS-P 0565 has been cancelled and the United States has paid the Settlement Amount to Invenergy or its designees under this Agreement.

[Three signature pages follow.]

**UNITED STATES DEPARTMENT OF THE INTERIOR**

Doug Burgum
Secretary of the Interior

Date: 6-12-26

**UNITED STATES DEPARTMENT OF JUSTICE**

______________________________

Stanley Woodward
Associate Attorney General

Date: 06.12.26

**INVENERGY CALIFORNIA OFFSHORE LLC**
**By Invenergy LLC, its Manager**

_______________________________
Daniel Runyan
Vice President

Date: 6/12/2024

# EXHIBIT C

CALIFORNIA
DEPARTMENT OF JUSTICE

**Rob Bonta**
***Attorney General***

600 WEST BROADWAY, SUITE 1800
SAN DIEGO, CA 92101

Public: (619) 738-9000
Telephone: (619) 738-9140
Facsimile: (916) 732-7920
E-Mail: Natalie.Collins@doj.ca.gov
Theodore.McCombs@doj.ca.gov

July 16, 2026

U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Secretary Douglas J. Burgum
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240

Acting Director Matthew Giacona
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Associate Attorney General Stanley Woodward
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Invenergy California Offshore LLC
One South Wacker Drive, Ste. 1500
Chicago, IL 60606

Jim Murphy, Chief Executive Officer
Invenergy California Offshore LLC
One South Wacker Drive, Ste. 1500
Chicago, IL 60606

**Re: Notice of Intent to Sue for Violations of the Outer Continental Shelf Lands Act via Cancellation of Lease Number OCS-P 0565**

Dear Secretary Burgum, Acting Dir. Giacona, Ass. Atty. General Woodward, and Mr. Murphy:

This letter serves as notice by the State of California, by and through Attorney General Rob Bonta and the California Energy Commission, of its intent to sue for violations of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331 *et seq.*, to the extent such notice is deemed necessary by a court, in connection with the settlement and cancellation of Outer Continental Shelf Lease OCS-P 0565. This letter constitutes a notice of violation and intent to file suit (Notice Letter) under Section 23(a) of OCSLA, as required by 43 U.S.C. § 1349(a)(2)(A). We are sending this Notice Letter to you because you may be named as a defendant or necessary party in California's intended suit.

California's anticipated OCSLA citizen suit will challenge the purported settlement agreement between the United States and Invenergy California Offshore LLC (Invenergy) announced on June 17, 2026 (Agreement), and the cancellation of offshore wind Lease OCS-P 0565, which is held by Invenergy, set out in that Agreement for failure to comply with obligations under OCSLA, its implementing regulations, and associated requirements.

Lease OCS-P 0565, which Invenergy acquired at a competitive lease sale in 2022, comprises 80,418 acres in the Morro Bay Wind Energy Area off California's central coast. Wind turbines in the Lease area were anticipated to produce up to 2 gigawatts of offshore wind energy that would provide electricity to California. The United States Bureau of Ocean Energy Management (BOEM) awarded Invenergy the Lease after years of analysis and extensive consultation, including with the Department of War.

On June 17, 2026, the United States Department of Interior announced that it had reached an agreement with Invenergy to terminate the lease and reimburse the company up to $111,769,231. This represents the amount that Invenergy paid for the lease, minus $33,530,769 in bid credits that would have supported workforce training, domestic supply chain development, and community benefits in California. The Agreement provides that Invenergy or its affiliates will invest $111,769,231 in other domestic energy projects and covenant not to sue, in exchange for the United States reimbursing Invenergy up to $111,769,231 and cancelling the Lease.

OCSLA declares the Outer Continental Shelf to be "a vital national resource reserve held by the Federal Government for the public," and directs the Secretary of the Interior to make the Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). OCSLA further declares that "the rights and responsibilities of all States . . . to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized." 43 U.S.C. § 1332(3), (5). Under 43 U.S.C. § 1337(p), OCSLA governs the development of energy resources other than oil and gas, including wind energy resources, on the Outer Continental Shelf.

The Agreement and the cancellation of Lease OCS-P 0565 set out in that Agreement violate OCSLA and its implementing regulations. Among other violations, the federal government (1) did not hold a hearing before deciding to cancel the Lease, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) did not suspend the Lease for five years before cancellation, in violation of 43 U.S.C. § 1334(a)(2)(B); (3) did not notify or coordinate with the Governors of the affected States, in violation of 43 U.S.C. §§ 1334(h) and 1337(p)(7); (4) did not consider the required statutory priorities under 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102; (5) did not follow the regulations for lease relinquishment under 30 C.F.R. § 585.435; (6) violated section 8 of the amended Lease agreement, which states that "[a]ny cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of the Act (43 U.S.C. §1334(a)(2)(B) and (C))" and that "[a]ny cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm

or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities," Amend. & Restatement of Renewable Energy Lease OCS-P 0565, § 8 (Jan. 14, 2025); and (7) otherwise failed to comply with OCSLA and its implementing regulations. The Agreement also provides for compensation in excess of the statutory formula for cancellations and suspensions, in violation of 43 U.S.C. §§ 1334(a)(2)(C) and 1341(d).

The Lease cancellation and Agreement adversely affect California's legal interest in the "expeditious and orderly development," 43 U.S.C. § 1332(3), of wind energy on the Outer Continental Shelf. California has invested over $100 million to support the development of wind energy off the coast of the State. These investments and the wind energy production they support would have generated economic benefits, improved grid reliability, lowered energy costs, diversified the State's energy supply, and advanced California's statutory clean energy and climate policy goals. Lease OCS-P 0565 was crucial to the success of the State's investments and important to its pursuit of these goals.

The Agreement and the Lease cancellation described above are causing ongoing harm to California, requiring California to take judicial action to compel compliance with OCSLA. Accordingly, pursuant to 43 U.S.C. § 1349(a), the State is hereby providing notice of OCSLA violations.

Please contact us if you have any questions or would like to discuss this matter. I declare under penalty of perjury that the foregoing is true and correct.

Sincerely,

*<u>/s/ Natalie Collins</u>*
MYUNG J. PARK
MICHAEL P. CAYABAN
Supervising Deputy Attorneys General
THEODORE A. MCCOMBS
NATALIE COLLINS
Deputy Attorneys General

For ROB BONTA
Attorney General

TAM:

cc: Drew Bohan, California Energy Commission Executive Director
Josh Robbins, Crowell & Moring LLP